# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SHARIF MOBLEY, *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>CENTRAL INTELLIGENCE AGENCY, *et al.*<br><br>Defendants. | Civil Action Nos. 11-2072, 11-2073 (BAH)<br><br>Judge Beryl A. Howell |

## <u>MEMORANDUM OPINION</u>

The plaintiffs, Sharif Mobley and his wife Nzinga Islam,[1] bring these two related actions against four federal government agencies—the Central Intelligence Agency ("CIA") and the Departments of State, Defense, and Justice—pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Privacy Act, 5 U.S.C. § 552a (collectively "FOIA/PA"). The plaintiffs filed FOIA/PA requests seeking access to, *inter alia*, all records relating to themselves, in an apparent effort to shed light upon the arrest of Mobley in Sana'a, Yemen on January 26, 2010, and his subsequent incarceration there. All four defendants provided final determinations regarding the plaintiffs' requests, some of which included the release of responsive records to the plaintiffs, and the plaintiffs now challenge the defendants' handling of the plaintiffs' requests on a number of grounds. The defendants contend that they have satisfied their obligations under the FOIA and the Privacy Act, and consequently they have moved for summary judgment on the plaintiffs' claims.[2]

---

[1] Both actions were originally brought by both plaintiffs, but Ms. Islam was terminated as a plaintiff in Civil Case No. 11-2073 on July 19, 2012. *See* First Am. Compl. ("FAC") ¶ 4, ECF No. 36 (No. 11-2073).

[2] Due to the sensitive nature of some of the information requested in this case, the Court submitted this memorandum opinion for preclearance review on February 1, 2013; no modification was made to the opinion as a result of that review.

## I.   BACKGROUND

On January 26, 2010, Mobley was "abducted" from the streets of Sana'a, Yemen and

held in the custody of the Yemeni government for several weeks, during which time he was

allegedly questioned by U.S. agents and given medical attention for wounds he suffered during

his abduction.  *See* Decl. of Cori A. Crider ("Crider Decl.") ¶¶ 8–10, 26–41, 47–48, ECF No. 24-

1 (No. 11-2072).  Mobley "is now alleged to have tried to escape from the Jumhori Hospital

where he was held *incommunicado*, shooting two guards, one fatally."  *See id.* ¶ 50.  Mobley

remains in Yemeni custody on murder charges and faces a potential death sentence.  *See id.* ¶ 53.

On July 22, 2010, after all of these events transpired, Mobley filed, through counsel, a

FOIA/PA request with defendants Department of Defense (or "Defense"), Department of State

(or "State"), and Department of Justice (or "Justice"), as well as to the Department of Homeland

Security, which is not a party to these related actions.  *See* Decl. of Sheryl L. Walter ("First

Walter Decl.") ¶ 4, ECF No. 24 (Aug. 1, 2012) (No. 11-2072); *id.* Ex. 1, ECF No. 24-1 (No. 11-

2072).  This request sought records relating to:

1. Mr. Mobley's abduction from the streets of Sana'a, Yemen on January 26, 2010.
2. U.S. agencies' involvement in that disappearance.
3. U.S. agencies' interrogation of Mr. Mobley in *incommunicado* detention in Yemen, at a time when he was suffering torture and/or cruel, inhuman, and degrading treatment (CIDT).
4. The wider pattern of U.S.-sponsored sweeps and proxy detention in Yemen from January 2010, of which Mr. Mobley's seizure is a part.

First Walter Decl. Ex. 1, at 2.  The request clarified that Mobley was requesting "all records in

any way relating to, pertaining to, or mentioning himself by any and all persons or entities,

including all persons acting on behalf of the United States."  *Id.*  Additionally, the request

provided sixteen categories of records intended "to elucidate the sorts of records in the likely

possession of the targeted agencies." *Id.* These categories included, *inter alia*, "[a]ny

records . . . created from November 2009 . . . between the federal government and the

government of Yemen regarding Mr. Mobley," including "[r]ecords discussing whether Mr.

Mobley was a target of intelligence interest" and "[a]ll records created after January 1, 2010,

relating to visits of U.S. agents . . . to Mr. Mobley" in the hospital or in prison. *See id.* at 4–5.

The July 22, 2010, request also sought expedited processing and a fee waiver. *See id.* at 6–7. On

August 15, 2011, both of the plaintiffs filed a separate FOIA/PA request with the CIA seeking

"all Central Intelligence Agency ('CIA') records about Mr. Mobley and Ms. Islam." Supp. Decl.

of Michele L. Meeks ("Second Meeks Decl.") Ex. 2, at 1, ECF No. 49-2 (May 25, 2012) (No.

11-2072). This request referred to Mobley's July 22, 2010 request "only for reference purposes"

and clarified that "the scope of this request is for *all* CIA records about Mr. Mobley and Ms.

Islam." *Id.*[3]

    The first agency to respond to the plaintiffs was the CIA. In a letter dated September 20,

2011, the CIA notified the plaintiffs that although, "[a]fter a thorough search of the appropriate

records system," the agency was "able to locate responsive material," the material "must be

denied in its entirety on the basis of . . . PA exemptions (j)(1) and (k)(1), and FOIA exemptions

(b)(1) and (b)(3)." Second Meeks Decl. Ex. 3, at 1, ECF No. 49-3 (No. 11-2072). The CIA's

first letter also stated that "[w]ith respect to responsive records that would reveal a classified

connection to the CIA . . . the CIA can neither confirm nor deny the existence or nonexistence of

records responsive to your request." *Id.* The CIA's refusal to confirm or deny the existence of

responsive records was "pursuant to FOIA exemptions (b)(1) and (b)(3), and PA exemptions

(j)(1) and (k)(1)." *Id.* On January 11, 2012, however, the CIA sent the plaintiffs "amended final

---

[3] Although the July 22, 2010 FOIA/PA request was sent to the CIA, along with the other defendants, the CIA's
response to that request is not at issue in this case. Rather, the plaintiffs only challenge the CIA's response to their
August 15, 2011 FOIA/PA request. *See* Compl. ¶¶ 8–14, ECF No. 3 (No. 11-2072).

response letters," which clarified that the initial response letter "contained inaccuracies," and the amended letters "correctly reported that the CIA's search for records that would reflect an open or otherwise acknowledged connection to Plaintiffs produced no responsive records."  Decl. of Michele L. Meeks ("First Meeks Decl.") ¶ 13, ECF No. 39 (May 25, 2012) (No. 11-2072).

The next agency to respond to Mobley's request was the State Department.[4]  On December 13, 2011, State granted Mobley's request for expedited processing.  *See* First Walter Decl. ¶ 9.  State notified Mobley on February 6, 2012, based upon the nature of the request, that "the offices that were reasonably likely to have responsive documents were the Central Foreign Policy Records, the Bureau of Diplomatic Security, the Office of Passport Services, the Office of Overseas Citizens Services, and the American Embassy in Sana'a."[5]  *Id.* ¶ 19; *see also id.* Ex. 8, ECF No. 24-8 (No. 11-2072).  Additionally, "based on information from other responsive documents, [State] also subsequently searched the Office of Legal Adviser."  First Walter Decl. ¶ 19.  From December 20, 2011 to May 25, 2012, State notified Mobley by letter each time searches of these components had been completed, and State either released the responsive records or notified Mobley of the reason for withholding records or portions thereof.  *See id.* ¶¶ 11–16; *see also id.* Exs. 7–13, ECF Nos. 24-7 to 24-13 (No. 11-2072).

The searches performed by State ultimately yielded 293 total records responsive to Mobley's request.  First Walter Decl. ¶ 35.  165 of these records were released to Mobley in full, 75 of the records were released in part with certain portions redacted, and 42 of the records were withheld in full.  *Id.*  The documents that were withheld from release, either in whole or in part,

---

[4] The responses of State and Justice were delayed somewhat due to issues relating to the plaintiffs' submission of privacy waivers.  *See, e.g.*, First Walter Decl. ¶¶ 5–7 (describing privacy waiver issues); Decl. of Dennis J. Argall ("First Argall Decl.") ¶¶ 7–8, ECF No. 25-1 (June 29, 2012) (No. 11-2073) (same).

[5] The State Department also indicates that some responsive documents "were located from another Department component," all of which were withheld in full, though the State Department has not publicly disclosed the component from which these documents were retrieved.  *See* First Walter Decl. ¶ 16; *see also id.* Ex. 13, ECF No. 24-13 (No. 11-2072).

were withheld pursuant to one or more of the following:  FOIA Exemptions 1, 5, 6, and 7(C);

and PA Exemptions (d)(5), (k)(1), and (k)(2).  *See id.* ¶¶ 36–53.  The remaining eleven records

were referred to the Department of the Army (in particular the Office of the Provost Marshal

General ("OPMG")) on  March 5, 2012, for their review and direct response to Mobley, and all

of these eleven records were eventually withheld in full by the OPMG, pursuant to FOIA

Exemption 1 and PA Exemption (k)(1).  *Id.* ¶ 35; *see also* FAC ¶¶ 21–24; Decl. of John G.

Hargitt ("First Hargitt Decl.") ¶¶ 4, 6, ECF No. 36-1 (June 25, 2012) (No. 11-2072).  Mobley

also filed a separate FOIA request with the OPMG on June 25, 2012, seeking any responsive

records beyond the eleven records that had already been referred by State to the OPMG.  *See*

FAC ¶ 31.  In response, the OPMG expedited the request and issued a final determination on

July 19, 2012, identifying one responsive record and withholding it in full, pursuant to FOIA

Exemption 1 and PA Exemption (k)(1).  *Id.* ¶¶ 31–32; *see also* Decl. of John G. Hargitt ("Second

Hargitt Decl.") ¶ 6, ECF No. 42-5 (Aug. 30, 2012) (No. 11-2073).

   The final agencies to provide a final response to Mobley were Defense and Justice.

Beginning with Defense, Mobley's counsel clarified with Defense that he only believed that

Defense possessed records responsive to line items 10, 14, and 15 of his FOIA/PA request.  *See*

FAC ¶¶ 11–12.[6]  Defense then referred this request to the Defense Intelligence Agency ("DIA"),

which is a component of Defense and was "most likely . . . to have potentially received

intelligence reports stemming from the alleged interrogations of Mr. Mobley by 'Khan from

DOD' or any other government agent or agency.'"  FAC ¶ 13; *see also* Decl. of Alesia Y.

Williams ("First Williams Decl.") ¶ 6, ECF No. 20 (June 18, 2012) (No. 11-2073).  On May 11,

2011, the DIA granted expedited processing of Mobley's request because "news articles

---

[6] These line items referred to a U.S. agent who allegedly interrogated Mobley in Yemen who identified himself as "Khan from DOD."  *See* First Walter Decl. Ex. 1, at 4–5; FAC ¶ 12.

suggested that plaintiff Sharif Mobley was facing trial in a capital case in Yemen."  First

Williams Decl. ¶ 7.  The DIA then "conducted a search to determine if [the DIA] was in

possession of any open-source news articles that referenced plaintiffs generally or the criminal

matter concerning plaintiff Sharif Mobley in Yemen."  *Id.* ¶ 8.  Although this search yielded

responsive records, "these articles were part of the general news monitoring performed by other

members of the Intelligence Community" and therefore "the DIA FOIA Office referred each of

these open-source news articles to the agency that originated the distribution with the request that

the distributor respond directly to the plaintiffs."  *Id.*  Despite the expedited status of Mobley's

request, it was not until May 4, 2012—nearly one year after the request was expedited—that the

DIA notified Mobley that 41 responsive documents "were referred to another government

agency" and that "[t]o the extent that [Mobley] is requesting any intelligence information in the

possession of DIA concerning himself or his family, my response is to advise you that DIA can

neither confirm nor deny the existence of the requested information."  First Williams Decl. Ex. A

at 1, ECF No. 20-1.[7]

The 41 responsive records identified by the DIA were located in the Open Source Center

("OSC") and referred to the CIA on June 17, 2011.  *See* Decl. of Michele L. Meeks ("Third

Meeks Decl.") ¶ 5, ECF No. 42-1 (Sept. 4, 2012) (11-2073).  The OSC "collects, monitors,

processes, analyzes, and disseminates publicly available information from primarily foreign

sources."  *Id.* ¶ 8.  Of the 41 documents referred to the CIA, 28 of the documents were released

in full, six of the records were referred back to Defense, one record was referred to State,[8] and

---

[7] Mobley also forwarded his request to the U.S. Special Operations Command ("SOCOM")—a component of Defense—on August 14, 2011, and on October 14, 2011, SOCOM "provided a 'no-records' response to plaintiff." *See* Decl. of Mark A. Clark ("Clark Decl.") ¶ 4, ECF No. 21 (No. 11-2073).  In his First Amended Complaint in No. 11-2073, Mobley has withdrawn the cause of action challenging SOCOM's response to their FOIA/PA request. *Compare* Compl. ¶¶ 18–25, ECF No. 3 (No. 11-2073), *with* FAC ¶¶ 9–36.

[8] Defense and State have since released these seven records to the plaintiffs.  *See* Third Meeks Decl. ¶ 6.

the CIA withheld the remaining six records under FOIA Exemption 3 because the six records, although technically publicly available, were "subject to limited distribution" and "reveal certain sensitive but unclassified intelligence sources and methods." *Id.* ¶¶ 6–7, 9. The CIA notified the plaintiffs of the decision to withhold these six documents by letter dated January 25, 2012. *See id.* ¶ 7.

Finally, the response to Mobley's FOIA/PA request by Justice, for purposes of these related actions, was made by the Federal Bureau of Investigation ("FBI"). The FBI informed Mobley by letter dated April 5, 2011 that it was processing his request and that the FBI was "searching the indices to our Central Records System [or 'CRS'] for the information you requested." *See* First Argall Decl. Ex. D at 1, ECF No. 25-5. The FBI granted Mobley's request for expedited processing by letter dated May 23, 2011. *See* First Argall Decl. Ex. I at 1, ECF No. 25-10. On August 17, 2011, after the plaintiffs submitted the privacy waiver of Ms. Islam, the FBI treated the privacy waiver as a new FOIA request, and assigned it a distinct tracking number. *See* First Argall Decl. Ex. N, ECF No. 25-15. On August 18, 2011, Mobley's counsel wrote the FBI an e-mail clarifying that Ms. Islam's privacy waiver "was not a new request; it was an additional waiver form for use when processing [Mobley's request], which was for records about Sharif Mobley *and his family*." First Argall Decl. Ex. O, ECF No. 25-16 (No. 11-2073).

On August 29, 2011, Mobley's counsel contacted the FBI via e-mail, asking that the agency "please ensure that you search for all 'main' files *and* all 'reference' or 'cross-reference' files" and also requesting that the FBI search ten specific types of records systems. *See* First Argall Decl. Ex. P at 1, ECF No. 25-17. Similarly, on September 21, 2011, Mobley's counsel contacted the FBI via e-mail to request that the FBI "include the Baltimore Field Office in your search" along with the Washington, D.C., Field Office. *See* First Argall Decl. Ex. R, at 1, ECF

7

No. 25-19.  On May 4, 2012—the same date that the DIA provided its final response—the FBI

notified Mobley that it had located eighty-five pages of responsive records, and in the same

correspondence the FBI released all eighty-five pages in part, with certain portions redacted

pursuant to one or more of the following:  FOIA Exemptions 1, 6, and 7(C); and PA Exemption

(j)(2).  *See* First Argall Decl. ¶ 24.

The plaintiffs filed both of the instant related actions on November 22, 2011, at which

time only the CIA had provided a final determination regarding the plaintiffs' FOIA/PA request.[9]

Currently pending before the Court are the defendants' motions for summary judgment, as well

as certain defendants' supplemental motions for summary judgment, in both related actions.  *See*

Def. Dep't of Defense's Supplemental Mot. for Summ. J., ECF No. 42 (No. 11-2073); Def.

Dep't of State's Supplemental Mot. for Summ. J., ECF No. 36 (No. 11-2072); Defs.' Mot. for

Summ. J., ECF No. 25 (No. 11-2073); Defs.' Mot. for Summ. J., ECF No. 22 (No. 11-2072).

For the reasons discussed below, the Court grants both motions in full, with one minor exception

discussed in more detail below.

## II.     LEGAL STANDARDS

### A.      FOIA

Congress enacted the FOIA to promote transparency across the government.  *See* 5

U.S.C. § 552; *Quick v. U.S. Dep't of Commerce, Nat'l Inst. of Standards & Tech.*, 775 F. Supp.

2d 174, 179 (D.D.C. 2011).  The Supreme Court has explained that the FOIA is "a means for

citizens to know 'what their Government is up to.'  This phrase should not be dismissed as a

convenient formalism.  It defines a structural necessity in a real democracy."  *Nat'l Archives &*

---

[9] The plaintiffs constructively exhausted their administrative remedies because twenty working days had elapsed either since they had submitted their FOIA requests or, in the case of the CIA, twenty working days had elapsed since the agency had received the plaintiffs' administrative appeal of the agency's final determination.  *See* Compl. ¶¶ 13, 24, ECF No. 3 (No. 11-2072); Compl. ¶¶ 16, 24, 37 (No. 11-2073); *see also* 5 U.S.C. § 552(a)(6) (providing for constructive exhaustion of administrative remedies in FOIA cases).

*Records Admin. v. Favish*, 541 U.S. 157, 171–172 (2004) (citation and internal quotation marks omitted).  "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed."  *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).  As a result, the FOIA requires federal agencies to release all records responsive to a request for production.  *See* 5 U.S.C. § 552(a)(3)(A).  Federal courts are authorized under the FOIA "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant."  *Id.* § 552(a)(4)(B).

This strong interest in transparency must be tempered, however, by the "legitimate governmental and private interests [that] could be harmed by release of certain types of information."  *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 559 (D.C. Cir. 2010) (internal quotation marks omitted); *see also Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 872 (D.C. Cir. 1992) (en banc).  Accordingly, Congress included nine exemptions permitting agencies to withhold information from FOIA disclosure.  *See* 5 U.S.C. § 552(b).  "These exemptions are explicitly made exclusive, and must be narrowly construed."  *Milner v. Dep't of the Navy*, 131 S. Ct. 1259, 1262 (2011) (citations and internal quotation marks omitted); *see also Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 869 (D.C. Cir. 2010) ("FOIA allows agencies to withhold only those documents that fall under one of nine specific exemptions, which are construed narrowly in keeping with FOIA's presumption in favor of disclosure." (citations omitted)).  When a FOIA requester properly exhausts its administrative remedies, it may file a civil action challenging an agency's response to its request.  *See* 5 U.S.C. § 552(a)(4)(B); *Wilbur v. CIA*, 355 F.3d 675, 677 (D.C. Cir. 2004).  Once such an action is filed, the agency generally has the burden of demonstrating that its response to the plaintiff's FOIA request was appropriate.

When an agency's response is neither to confirm nor deny the existence of responsive

documents—commonly known as a *Glomar* response[10]—the agency "must demonstrate that

acknowledging the mere existence of responsive records would disclose exempt information."

*Elec. Privacy Info. Ctr. v. NSA*, 678 F.3d 926, 931 (D.C. Cir. 2012).  "In *Glomar* cases, courts

may grant summary judgment on the basis of agency affidavits that contain 'reasonable

specificity of detail rather than mere conclusory statements, and if they are not called into

question by contradictory evidence in the record or by evidence of agency bad faith.'"  *Id.*

(quoting *Gardels v. CIA*, 689 F.2d 1100, 1105 (D.C. Cir. 1982)).  "The supporting affidavit must

justify the *Glomar* response based on 'general exemption review standards established in non-

*Glomar* cases.'"  *Id.* (quoting *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007)).

When an agency's response to a FOIA request is to withhold responsive records, either in

whole or in part, the agency "bears the burden of proving the applicability of claimed

exemptions."  *Am. Civil Liberties Union v. U.S. Dep't of Def.* ("*ACLU/DOD*"), 628 F.3d 612,

619 (D.C. Cir. 2011).  "The government may satisfy its burden of establishing its right to

withhold information from the public by submitting appropriate declarations and, where

necessary, an index of the information withheld."  *Am. Immigration Lawyers Ass'n v. U.S. Dep't*

---

[10] *Glomar* responses are "named for the *Hughes Glomar Explorer,* a ship used in a classified Central Intelligence Agency project 'to raise a sunken Soviet submarine from the floor of the Pacific Ocean to recover the missiles, codes, and communications equipment onboard for analysis by United States military and intelligence experts.'" *Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1171 (D.C. Cir. 2011) (quoting *Phillippi v. CIA*, 655 F.2d 1325, 1327 (D.C. Cir. 1981)).

In the 1986 Freedom of Information Reform Act, Congress codified in § 552(c) the use of a *Glomar* response for the following three limited categories of agency records:  (1) law enforcement records described in § 552(b)(7)(A), which if disclosed could reasonably be expected to interfere with enforcement proceedings; (2) informant records; and (3) certain classified records maintained by the FBI.  Pub. L. No. 99-570, §§ 1801–04, 100 Stat. 3207, 3207-48 to 3207-50 (1986); *see* 5 U.S.C. § 552(c) (for these excluded categories of records, allowing agencies to "treat the records as not subject to the requirements of this section"); *see also Benavides v. DEA*, 976 F.2d 751, 752–53 (D.C. Cir. 1992) (per curiam) (construing the phrase "not subject to the requirements of this section" to "permit a Glomarization where the information's status has not been officially confirmed, but to permit analysis under other exemptions like that afforded any other document sought under FOIA, where the status has been so confirmed"). Even if any of the defendants in this action were relying upon § 552(c) to withhold any records, the Court would not be permitted to comment on the public record about the existence of such reliance.

*of Homeland Sec.*, 852 F. Supp. 2d 66, 72 (D.D.C. 2012) (citing *Vaughn v. Rosen*, 484 F.2d 820, 827–28 (D.C. Cir. 1973)).  "If an agency's affidavit describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption," and "is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary judgment is warranted on the basis of the affidavit alone."  *ACLU/DOD*, 628 F.3d at 619.  "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical or 'plausible.'"  *Id.* (internal quotation marks omitted) (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)).

When a requester challenges an agency's response based on the adequacy of the search performed, "[t]o prevail on summary judgment . . . the defending 'agency must show beyond material doubt . . . that it has conducted a search reasonably calculated to uncover all relevant documents.'"  *Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007) (quoting *Weisberg v. U.S. Dep't of Justice* ("*Weisberg I*"), 705 F.2d 1344, 1351 (D.C. Cir. 1983)).  "In order to obtain summary judgment the agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested."  *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).  "Summary judgment may be based on affidavit, if the declaration sets forth sufficiently detailed information 'for a court to determine if the search was adequate.'"  *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 838 (D.C. Cir. 2001) (quoting *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995)).

**B.**     **Privacy Act**

The Privacy Act, 5 U.S.C. § 552a, "regulates the 'collection, maintenance, use, and dissemination of information' about individuals by federal agencies."  *Wilson v. Libby*, 535 F.3d 697, 707 (D.C. Cir. 2008) (quoting *Doe v. Chao*, 540 U.S. 614, 618 (2004)).  The statute

provides that, if any federal agency maintains a "system of records," it must "upon request by any individual to gain access to his record or to any information pertaining to him which is contained in the system, permit him . . . to review the record and have a copy made of all or any portion thereof in a form comprehensible to him." 5 U.S.C. § 552a(d)(1).  The statute defines a "system of records" as "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." *Id.* § 552a(a)(5).  If an agency "refuses to comply with an individual request," the individual may bring a civil action against the agency. *See id.* § 552a(g)(1)(B).

The Privacy Act, however, also permits agencies to exempt certain systems of records from the requirements of § 552a(d).  *See* 5 U.S.C. § 552a(j)–(k)  When an agency moves for summary judgment on the basis of a statutory exemption, it "bears the burden of sustaining its decision to claim an exemption from disclosure."  *Wheeler v. CIA*, 271 F. Supp. 2d 132, 136 (D.D.C. 2003) (citing 5 U.S.C. § 552a(g)(3)(A)).  Much like in the FOIA context, at the summary judgment stage, "[i]n a Privacy Act case, the Court may rely on agency affidavits or declarations."  *Jimenez v. Exec. Office for U.S. Attorneys*, 764 F. Supp. 2d 174, 180 (D.D.C. 2011); *accord Chambers v. U.S. Dep't of Interior*, 568 F.3d 998, 1003 (D.C. Cir. 2009) (holding that "[i]n a suit seeking agency documents—whether under the Privacy Act or FOIA—'[a]t the summary judgment stage . . . the court may rely on a reasonably detailed affidavit").

## III.   DISCUSSION

In these related actions, the plaintiffs challenge four separate aspects of the defendants' responses to the plaintiffs' FOIA/PA requests.  First, the Court will address the plaintiffs' challenges to the adequacy of certain defendants' searches for records.  Second, the Court will discuss the plaintiffs' challenges to the propriety of certain defendants' *Glomar* responses, *i.e.*,

refusals to confirm or deny the existence of responsive records.  Third, the Court will discuss whether the defendants have adequately justified their determinations to withhold certain responsive records.  Finally, the Court will assess whether certain defendants sufficiently established that all "reasonably segregable portion[s]" of the withheld records were provided to the plaintiffs.  *See* 5 U.S.C. § 552(b).

### A.   The Adequacy of the Defendants' Searches

As discussed above, "an agency responding to a FOIA request must 'conduct[] a search reasonably calculated to uncover all relevant documents,' and, if challenged, must demonstrate 'beyond material doubt' that the search was reasonable."  *Truitt v. Dep't of State,* 897 F.2d 540, 542 (D.C. Cir. 1990) (footnotes omitted) (quoting *Weisberg I*, 705 F.2d at 1351).  The adequacy of a search "is judged by a standard of reasonableness and depends, not surprisingly, upon the facts of each case."  *Weisberg v. U.S. Dep't of Justice* ("*Weisberg II*"), 745 F.2d 1476, 1485 (D.C. Cir. 1984).  "The question is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was *adequate*."  *Steinberg v. U.S. Dep't of Justice*, 23 F.3d 548, 551 (D.C. Cir. 1994) (quoting *Weisberg II*, 745 F.2d at 1485). "Mere speculation that as yet uncovered documents may exist does not undermine the finding that the agency conducted a reasonable search for them."  *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991).

### 1.   *CIA*

The plaintiffs first contend that the CIA's search for records reflecting an open or otherwise acknowledged affiliation between the CIA and the plaintiffs was inadequate for two reasons.  First, the plaintiffs argue that the CIA "improperly failed to search the OSC for responsive records" based on the fact that 41 responsive records from the OSC were referred to the CIA by the DIA.  *See* Pls.' Opp'n to Def.'s Mot. for Summ J. ("Pls.' Opp'n") at 7, ECF No.

40 (No. 11-2072). Second, the plaintiffs argue that the CIA "improperly failed to search the FOIA office for records about Plaintiffs," which the plaintiffs say was within the scope of their request for records. *Id.* at 7–8.

> a)      *Failure to Search the Open Source Center for Responsive Records*

With respect to the plaintiffs' complaint about the failure to search the OSC, the CIA responds that because "most of the records contained in the DNI OSC are generally available to the public both through their original sources and through the World News Connection, CIA presumes in most cases that a FOIA requester does not want CIA to search those records unless the requester specifically asks for them." Defs.' Reply in Supp. Mot. for Summ. J. ("Defs.' Reply") at 3, ECF No. 49 (No. 11-2072). The CIA contends that such a policy is reasonable for two main reasons. First, it "ensures that requesters do not receive public records that they do not want, particularly when requesters will often be charged fees for an agency to process and release publicly available material." *Id.* Additionally, "requiring requesters to submit separate requests for publicly available records is consistent with FOIA's requirement that agencies 'make records promptly available' because public records can often . . . be released more quickly without [the] need to process them for redactions." *Id.* (citation omitted); *see also Cunningham v. Holder*, 842 F. Supp. 2d 338, 345–46 (D.D.C. 2012) ("The requirement of a specific request for public records makes sense."). Alternatively, the CIA responds that it will agree to search the OSC and turn over any responsive records, "but it will charge plaintiffs fees for that purpose" because "plaintiffs should not be entitled to circumvent the applicable access fees [from World News Connection or Westlaw] and obtain those records for free simply by submitting a FOIA request." *Id.* at 3–4; *see also* Second Meeks Decl. ¶¶ 6–13 (explaining the CIA's policy regarding search for publicly available records in response to FOIA requests).

The plaintiffs, however, contest the CIA's premise that the OSC is comprised mostly of publicly available records. Most glaringly, the plaintiffs point out that "[o]f the twenty-eight released records, *twelve* are available on the World News Connection" and "twelve out of twenty-eight is not 'most' by even the most lenient standards." Pls.' Sur-Reply to Defs.' Mot. for Summ. J. ("Pls.' Surreply") at 2, ECF No. 53 (No. 11-2072). The plaintiffs also observe that "the fact that CIA withheld seven records in full speaks volumes about whether or not this information is publicly available." *Id.* The plaintiffs concede that "CIA should not have to process OSC records which are available on the World News Connection," but they argue instead that "CIA should . . . be required to search for and process all OSC records which are *not* [publicly available]." *Id.*

On the one hand, the CIA is correct that a policy of "generally interpret[ing] [first-person] FOIA requests . . . to be for non-public documents" is reasonable for all of the reasons that similar policies have been upheld in prior cases. Defs.' Reply at 3 (No. 11-2072); *see, e.g.*, *Cunningham*, 842 F. Supp. 2d at 345 ("EOUSA's request that Plaintiff submit a separate specific request for public records is consistent with FOIA's requirements."); *McLaughlin v. U.S. Dep't of Justice*, 598 F. Supp. 2d 62, 66 & n.2 (D.D.C. 2009) (upholding agency's decision to charge duplication fees for publicly available records and observing that a policy of presuming that FOIA requests are for only non-public records "comports with the statutory requirement that agencies 'make [responsive] records promptly available'"). The problem for the CIA is that only "[m]ost material from the OSC is . . . available to the public," Second Meeks Decl. ¶ 7, and therefore some portion of the records contained in the OSC database are necessarily non-public. This point is confirmed by the plaintiffs' statement that only twelve of the twenty-eight OSC records it received from the CIA were publicly available. *See* Pls.' Surreply at 2 (No. 11-2072). In other words, although the CIA's policy regarding the processing of publicly available records

15

is reasonable in theory, that policy does not apply to the entire OSC database, and for that reason the CIA's determination not to search the OSC database in response to the plaintiffs' request is problematic to the extent that non-public, responsive records exist in the OSC.

The CIA appears to agree that the plaintiffs are entitled to receive any non-public, responsive records contained in the OSC database, free of charge. *See* Second Meeks Decl. ¶ 12 ("The [CIA] recognizes that, with respect to non-public records, requestors should generally be able to obtain information about themselves free of charge . . . ."). Similarly, the plaintiffs agree that "CIA should not have to process OSC records which are [not publicly] available." Pls.' Surreply at 2 (No. 11-2072). The practical problem lies in deciding which party has the burden of determining which OSC records are publicly available and which are not. The plaintiffs propose placing that burden on the CIA. *See id.* The CIA, however, proposes placing that burden on the plaintiffs by essentially presuming that all OSC records are publicly available and charging fees for the production of all such records. *See* Defs.' Reply at 4 (No. 11-2072).

The parties have presented no evidence regarding how burdensome it would be to distinguish between public and non-public records retrieved from the OSC, but this will often be self-evident with the publication origin of the document, apparent on its face. Thus, the CIA must search the OSC database for any records responsive to the plaintiffs' FOIA/PA request and must release any non-exempt, responsive records to the plaintiffs. Additionally the CIA may choose, in its discretion, to charge fees to the plaintiffs for any records that it produces from this search that it identifies as being publicly available, and the plaintiffs may challenge any fees that they believe are improperly levied on this basis.[11] If the plaintiffs object to any of the fees

---

[11] The CIA indicates that it has a policy of requiring FOIA requesters to "commit to pay fees before the [CIA] will process" requests for publicly available records. *See* Second Meeks Decl. ¶ 13. The plaintiffs do not challenge this policy in the instant related actions, and thus the plaintiffs should expect to comply with this policy if they seek to have the CIA perform a search of the OSC database.

charged, they should raise those objections at the administrative level before challenging them in

a civil action, in order to give the agency an opportunity to correct any errors it may have made

before seeking assistance from a court.  *See, e.g.*, *Avocados Plus Inc. v. Veneman*, 370 F.3d

1243, 1247 (D.C. Cir. 2004) (holding that administrative exhaustion is intended, *inter alia*, to

"giv[e] agencies the opportunity to correct their own errors" (internal quotation mark omitted)).

        *b)*        *Failure to Search the FOIA Office for Responsive Records*

The plaintiffs also argue that the CIA's search was inadequate because it "improperly

failed to search the FOIA office for records about Plaintiffs."  Pls.' Opp'n at 7 (No. 11-2072).

The CIA states that its FOIA officers "do not consider records of previous FOIA, PA, or

[Mandatory Declassification Review, or 'MDR'] requests . . . to be responsive to a current

request" except where a request "expressly seek[s] records of previous FOIA, PA, or MDR

requests by the requester."  First Meeks Decl. ¶ 14.  The plaintiffs nevertheless complain that

their FOIA/PA requests "were explicitly 'for *all* CIA records about Mr. Mobley and Ms. Islam'"

and "it is in violation of FOIA for CIA to impose a requirement that 'requests expressly seek[]

records of previous FOIA, PA, or MDR requests.'"  Pls.' Opp'n at 7–8 (No. 11-2072).  The

CIA's response is that they interpreted the plaintiffs' August 15, 2011, FOIA/PA request to

"expressly *disclaim*[] any interest in records regarding the [July 22, 2010] version of their FOIA

request."  Defs.' Reply at 4 (No. 11-2072).  In support of this argument, the CIA cites language

from the plaintiffs' August 15, 2011 request, which stated that it was mentioning the July 22,

2010 request "only for reference purposes."  *See id.*; *see also* Second Meeks Decl. Ex. 2, at 1.

The CIA says that it "interpreted that statement as an express disavowal of plaintiffs' interest in

obtaining records regarding the July 22, 2010 request" and that such an interpretation was "perfectly reasonable."  Defs.' Reply at 4 (No. 11-2072).[12]

The D.C. Circuit has established that an agency "has a duty to construe a FOIA request liberally," *Nation Magazine*, 71 F.3d at 890, and are "bound to read it as drafted" not as "agency officials . . . might wish it was drafted," *Miller v. Casey*, 730 F.2d 773, 777 (D.C. Cir. 1984).  In this regard, it is clear that, for example, when a FOIA requester "seek[s] all of a certain set of documents" while also "evincing a heightened interest in a specific subset thereof," such a request "is reasonably susceptible to the broader reading" of seeking the entire set of documents despite the fact that a specific subset of documents is named.  *LaCedra v. Exec. Office for U.S. Attorneys*, 317 F.3d 345, 348 (D.C. Cir. 2003); *see also Nation Magazine*, 71 F.3d at 890 (holding that FOIA request seeking records "'pertaining to' [Ross] Perot" and specifically "ask[ing] for records indexed under Perot's name" was "sufficient to alert the agency that appellants sought information about Perot, even if it was not indexed under his name").

In this case, the language of plaintiffs' request sent mixed signals about the request's intended scope.  On the one hand, it explicitly sought "all [CIA] records about Mr. Mobley and Ms. Islam," but it also explicitly deemphasized the relevance of the plaintiffs' prior FOIA/PA request by stating that it referred to that request "only for reference purposes."  Second Meeks Decl. Ex. 2, at 1.  It is unclear from the four corners of the August 15, 2011 request what the plaintiffs meant by "only for reference purposes," but the CIA was reasonable in interpreting "only for reference purposes" to mean *not* for purposes of expressing an interest in records associated with prior FOIA/PA requests.  Thus, the plaintiffs' specific disclaimer regarding the July 22, 2010 request could be reasonably interpreted to disavow an interest in obtaining records

---

[12] By making this argument, the CIA implies that the plaintiffs' July 22, 2010 FOIA/PA request was the *only* previous FOIA/PA request made by the plaintiffs to the CIA, though the record is unclear on whether this is in fact the case.

about that prior request, and therefore the CIA's decision not to search its FOIA office for responsive records was reasonable.[13]

In sum, the Court holds that the CIA is only entitled to a partial grant of summary judgment regarding the adequacy of its search. The CIA must search the OSC for records responsive to the plaintiffs' request, as discussed *supra*. The CIA is, however, entitled to summary judgment as to the adequacy of all other aspects of its search.

### 2.    *State Department*

Next, the plaintiffs challenge the adequacy of the State Department's search on the grounds that "State failed to follow clear leads when performing its search for responsive records." Pls.' Opp'n at 27 (No. 11-2072). In their surreply, the plaintiffs clarify that they "concede the adequacy of the majority of State's search" and only challenge State's failure to assert that it searched the component where eighteen classified documents originated. *See* Pls.' Surreply at 8 (No. 11-2072). The only information that State has provided on the public record regarding these eighteen documents, which State refers to as X1–X18, are the year in which each document was created and the number of pages contained in each document. *See* First Walter Decl. ¶¶ 182–99. Other than this, State maintains that "[n]o further information can be provided regarding [these] document[s] on the public record." *Id.* The government has also "submitted a classified, ex parte, in camera filing" that elaborates on the nature of records X1–X18. *See* Notice of Ex Parte, In Camera Filing, ECF No. 29 (No. 11-2072). As the plaintiffs concede, the State Department has no obligation to name the component from which these eighteen documents originate. *See* Pls.' Surreply at 8 (No. 11-2072) (conceding that "State does not have to describe these records, or even the component in which they originated"). Upon review of the

---

[13] Since the Court bases its holding about the reasonableness of the CIA's decision on the particular language of the plaintiffs' request, the Court need not address the reasonableness of the CIA's broader policy of considering records of previous FOIA, PA, or MDR requests to be non-responsive unless a requester specifically requests such records.

government's *ex parte*, *in camera* filing, in conjunction with the public declarations submitted by the State Department, the Court is satisfied that the State Department searched all of its components reasonably likely to contain responsive information.  Therefore, the State Department's search was adequate, and the plaintiffs' objections to the State Department's search are unavailing.

### 3.   *FBI*

In his final challenge related to search adequacy, Mobley contends that the FBI's search for responsive records was inadequate for two interrelated reasons.  First, he says that the FBI's search was inadequate because it did not search certain specific records systems that Mobley's counsel asked it to search.  *See* Pl.'s Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Opp'n") at 21–22, ECF No. 45 (No. 11-2073).  Second, Mobley argues that "[t]he inadequacy of FBI's search is demonstrated by the ample evidence that other records exist."  *Id.* at 22.  For this point, Mobley cites the fact that, in related Civil Case No. 11-2072, "State produced numerous records to Mobley, some of which consisted of extensive email traffic between State and FBI," which "demonstrate the existence of significant email records about Mobley that were not identified in FBI's search," and Mobley also points to certain press coverage, which indicated that "FBI was even discussing Mobley with the press," yet "no records of interaction with the press were identified by FBI's search."  *Id.*

To provide some context to Mobley's argument, as discussed briefly above, Mobley's counsel contacted the FBI via e-mail on August 29, 2011—slightly more than thirteen months after Mobley submitted his FOIA/PA request to the FBI—to ask that:

> [W]hen conducting your search for responsive records, please ensure that you search all "main" files *and* all "reference" or "cross-reference" files, and that you search the following records systems:

> 1) *all* shared drives, including the "I-drive" and "S-drive," especially for FBI [Headquarters] and the New Jersey and New York field offices (this includes shared drives which have been assigned letters besides "I-drive" and "S-drive");
> 2) the ELSUR index;
> 3) all "tickler" files;
> 4) Automated Case Support (ACS) files;
> 5) Electronic Case Files (ECF);
> 6) Universal Index Files (UIF);
> 7) Investigative Case Management (ICM) files;
> 8) Legal Attache (LEGAT) files, especially for LEGATs with responsibility for Yemen from 2006 to the present;
> 9) Confidential Source System (CSS) files; and
> 10) all "zero" files or other record systems not identified above which are not normally searched in response to FOIA/PA requests.

First Argall Decl. Ex. P, at 1.  As explained in the Bureau's sworn declaration, "[t]he FBI conducted a search of the [Central Records System, or 'CRS'] utilizing a phonetic breakdown of Sharif Mobley's name, including any variations of the first and last name that sound like or are spelled differently than the name."  First Argall Decl. ¶ 31.  "The FBI also used the plaintiff's date of birth to facilitate the identification of responsive records."  *Id.*  The CRS "enables the FBI to maintain all information which it has acquired in the course of fulfilling its mandated law enforcement responsibilities" and includes "administrative, applicant, criminal, personnel, and other files compiled for law enforcement purposes."  *Id.* ¶ 25.  "The CRS currently consists of over 115 million records."  Second Decl. of Dennis J. Argall ("Second Argall Decl.") ¶ 3, ECF No. 50-2 (Oct. 12, 2012) (No. 11-2073).

Although Mobley concedes that "several of these systems" that his lawyer specifically requested to be searched, including ACS, ECF, UIF, ICM, and LEGAT, "have been incorporated into the CRS," Mobley maintains that "many have not, including the shared drives, the ELSUR index, 'tickler' files, CSS files, 'zero' files, and emails."  Pl.'s Opp'n at 21–22 (No. 11-2073). Several of these complaints were cleared up by the FBI's second sworn declaration, which clarified that (1) the FBI's original search would have identified any CSS or "zero" files, Second

Argall Decl. ¶ 6, (2) the ELSUR indices were searched and yielded no responsive results, *see id.* ¶ 8, and (3) because "tickler" files "were a phenomenon associated with earlier times in the FBI" and "would have been historical in nature," there "is no need for the FBI to search for tickler files" absent an express request to do so, *see id.* ¶ 7. Finally, the FBI contends that it need not search shared drives or unspecified e-mail systems "[g]iven the broad search of the comprehensive CRS system and the ELSUR indices" and Mobley's failure to ask the FBI specifically to search e-mail systems. *See id.* ¶ 9(b); Defs.' Reply in Supp. of Mot. for Summ. J. ("Defs.' Reply") at 16–19, ECF No. 50 (No. 11-2073). Specifically, the FBI argues that, with respect to the documents that Mobley says exist based on documents produced by State, "FBI's failure to turn up documents that plaintiff speculates exist does not mean that FBI's search was inadequate." Defs.' Reply at 18 (No. 11-2073) (citing *Wilbur*, 355 F.3d at 678).

Mobley does not appear to contest the FBI's explanations regarding the CSS files, "zero" files, ELSUR indices, or "tickler" files. Instead, Mobley focuses his attention on the FBI's refusal to search shared drives and unspecified e-mail systems. *See* Pl.'s Sur-Reply to Defs.' Mot. for Summ. J. ("Pl.'s Surreply") at 11–13, ECF No. 55 (No. 11-2073). As to the shared drives, Mobley cites a D.C. Circuit case that he says rejected the FBI's argument, *i.e.*, that a comprehensive search of the CRS and the ELSUR indices would render any further searching unduly burdensome. *See* Pl.'s Surreply at 12 (citing *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 28 (D.C. Cir. 1998)). *Campbell* stands for the proposition that "the court evaluates the reasonableness of an agency's search based on what the agency knew at [the search's] conclusion rather than what the agency speculated at its inception." *Campbell*, 164 F.3d at 28. Thus, the Court held that even though "the FBI started with the reasonable assumption that only a CRS review would be necessary . . . that assumption became untenable once the FBI discovered information suggesting the existence of documents that it could not locate without

expanding the scope of its search." *Id.* In particular, in *Campbell*, "some of the Bureau's own documents suggest[ed]—through administrative annotations and express references in the text—that searching [other records systems] would have identified additional information." *Id.* at 27.

Mobley contends that *Campbell* "is important for three separate but equally important reasons." Pl.'s Surreply at 12 (No. 11-2073). First, Mobley argues that the FBI was required to search all shared drives and unspecified e-mail systems for responsive records because he "established in his Opposition several places in FBI's release which suggest the existence of documents it had not located." *Id.* at 13. Hence, Mobley contends that "upon discovering this information, [the FBI] was required to expand its search to locate any responsive documents located in other systems." *Id.* (citing *Campbell*, 164 F.3d at 28). In his opposition brief, Mobley did cite *one* example in the FBI's release that could have suggested the existence of other, unreleased FBI documents.[14] In particular, Mobley stated in his opposition that "[d]uring the course of several interviews documented in released records, Mobley and the interviewers discussed an FBI investigation into his wife and mother-in-law for unemployment fraud" and "[n]o records of this investigation were released or withheld by FBI." Pl.'s Opp'n at 22–23 (No. 11-2073).

Mobley urges that this information in released FBI records constitutes "significantly more than 'mere speculation'" and warrants more extensive searching by the FBI. *Id.* at 23–24.

---

[14] Mobley also points to several "leads" contained in documents released by the State Department, rather than the FBI. *See* Pl.'s Opp'n at 22 (No. 11-2073). The FBI was not required, however, to follow up on leads contained in documents released by *other agencies*. An agency's obligation to follow up on "leads" is limited to the duty not to "ignore what it cannot help but know" and "pursue only a lead [the agency] cannot in good faith ignore." *Kowalczyk v. Dep't of Justice*, 73 F.3d 386, 389 (D.C. Cir. 1996). Though an agency must follow up on leads that it "cannot in good faith ignore," an agency has no obligation, let alone the resources, to follow up on leads that might be contained in documents released by other agencies. Since the record in this case does not indicate that the FBI was aware of the existence of any leads contained in State Department records before the conclusion of the FBI's search process, *see Campbell*, 164 F.3d at 28, the FBI had no obligation to follow up on any leads contained in those records. Nor did the FBI have an obligation to follow up on leads contained in press coverage of Mobley, as Mobley argues. *See* Pl.'s Opp'n at 22 (No. 11-2073) (citing *New York Times* article and complaining that "no records of interaction with the press were identified by FBI's search either").

The Court disagrees.  Even assuming that the released FBI records establish the existence of an

FBI investigation into Ms. Islam, such records would not have been responsive to Mobley's

FOIA request in any event.  The parties do not address this point, but Mobley's request generally

sought "all records in any way relating to, pertaining to, or mentioning [*Mobley*]."  First Argall

Decl. Ex. A at 2.  The request also specifically sought records relating to Mobley's abduction in

Yemen on January 26, 2010, the United States government's involvement in that abduction, and

the United States government's interrogation of Mobley while he was detained in Yemen.  *Id.*  In

specifying the types of records contemplated by these specific categories, the request also

mentioned "all records created after January 1, 2010, relating to the Mobley family's dealings at

the U.S. Embassy-Sana'a."  *Id.* at 3 (emphasis added).  Nowhere in this request, however, did

Mobley say that he was requesting all documents about Ms. Islam.  Indeed, the only reference to

Ms. Islam was within the request for "all records created after January 1, 2010, relating to *the*

*Mobley family's dealings at the U.S. Embassy-Sana'a*."  *Id.* (emphasis added).  Thus, although

Mobley complains that he is entitled to records about an investigation into his wife for

unemployment fraud, records of such an investigation would not be responsive to even the most

liberal construction of Mobley's FOIA/PA request.  The D.C. Circuit has long held that "mere

reference to other files does not establish the existence of documents that are relevant to [a

requester's] FOIA request."  *Steinberg*, 23 F.3d at 552; *see id.* ("If that were the case, an agency

responding to FOIA requests might be forced to examine virtually every document in its files,

following an interminable trail of cross-referenced documents like a chain letter winding its way

through the mail.").  Therefore, Mobley's argument that the FBI's failure to produce any records

about the investigation into Ms. Islam indicates a deficiency in the Bureau's search is unavailing.

Second, Mobley observes that, in *Campbell* the "FBI conceded that it would have to

perform an ELSUR search if specifically asked to do so within the FOIA request."  Pl.'s Surreply

at 12 (No. 11-2073) (emphasis omitted).  From this, Mobley posits that the FBI was required to search all shared drives because Mobley "specifically instruct[ed] FBI" to do so.  *Id.*  Mobley's reasoning on this point, however, is incorrect as a matter of law.  At the outset, Mobley's reliance on *Campbell* for the proposition that the "FBI conceded that it would have to perform an ELSUR search if specifically asked to do so within the FOIA request," *id.*, is misleading.  The portion of the *Campbell* opinion to which Mobley refers was a recitation by the Court of the FBI's argument that "the 'weight of authority' justifies refusing to supplement a CRS search with an ELSUR search unless specifically asked to do so within the FOIA request."  *See Campbell*, 164 F.3d at 28.  Regardless of what this statement suggests about what the FBI "conceded," the FBI's arguments in litigation do not amount to FOIA precedent.  This concession would not help Mobley in any event because Mobley's specific demands in this case came over a year after Mobley's FOIA request was submitted, in an unsolicited e-mail from his counsel, rather than "within the FOIA request."  *See id.*  Although Mobley attempts to shoehorn such communications into the ambit of *Campbell* by arguing that the FBI's purported concession extends to the entire "FOIA request process," Pl.'s Surreply at 12 (No. 11-2073), it is the law in this Circuit that an agency "is not obligated to look beyond the four corners of the [FOIA] request for leads to the location of responsive documents," *Kowalczyk*, 73 F.3d at 389.

Relatedly, Mobley's argument that the FBI was required to search all shared drives because Mobley "specifically instruct[ed] FBI" to do so, Pl.'s Surreply at 12 (No. 11-2073), fundamentally misconceives the standard for the adequacy of an agency's search under the FOIA.  An agency's search obligations are not dictated by a requester's demands to search particular components or databases.  Rather, an agency's search obligations are dictated by whether the scope of the search is "reasonably calculated to uncover all relevant documents," *Morley*, 508 F.3d at 1114—a standard that an agency satisfies by searching "all files likely to

contain responsive materials (if such records exist)," *Oglesby*, 920 F.2d at 68.  Thus, even when

a requester specifically asks an agency to search a particular database, the agency has no

obligation to do so unless that database is "likely to contain responsive materials."  *See id.*

*Campbell* stands for this very proposition.  In that case, the D.C. Circuit held that the FBI was

required to search the ELSUR and "tickler" files, but only because "some of the [FBI's]

documents suggest . . . that searching the ELSUR index, or searching for ticklers, would have

identified additional information [responsive to the request]."  *Campbell*, 164 F.3d at 27; *see also*

*id.* at 28 ("[A]n agency 'cannot limit its search to only one record system if there are others *that*

*are likely to turn up the information requested*.'" (emphasis added) (quoting *Oglesby*, 920 F.2d

at 68)).  In this case, Mobley has offered no reasoned argument why a search of "all shared

drives," as per his counsel's informal e-mail request, would be likely contain responsive

materials, other than the fact that he specifically asked for these drives to be searched and the

incorrect assertion, discussed above, that "several places in FBI's release . . . suggest[ed] the

existence of [unreleased, responsive] documents."  Pl.'s Surreply at 12–13 (No. 11-2073).

Absent some reason to believe that shared drives are likely to contain responsive materials,

Mobley's arguments are insufficient to require the FBI to conduct further searches.

Mobley's final argument under *Campbell* is that the FBI has not accounted for all shared

drives in its sworn declaration.  *See* Pl.'s Surreply at 12 (No. 11-2073).  Mobley complains that,

in the FBI's second sworn declaration, it "only addresses the 'I-drive' and 'S-drive'" but

"mak[es] no mention of other shared drives and why they were not searched."  *Id.*  In addition to

discussing the "I-Drive" and "S-Drive" in its second sworn declaration, the FBI also appeared to

speak more categorically regarding "shared drives."  *See* Second Argall Decl. ¶ 9(b).  From the

FBI's declaration it is difficult to ascertain with certainty whether "S-Drive" is a generic term

used within the FBI to refer to all "shared drives" or whether the FBI maintains multiple kinds of

shared drives that may be limited in use to function or location.  *See id.* ("'S-Drive systems are common drives or shared drives that are currently used by the FBI headquarters and field offices.").  Mobley's counsel also asserts for the first time in his surreply that he "recently learned of the existence of a 'T-Drive,'" which he implies may also be a shared drive, though he has offered no evidence to support such an implication.  *See* Pl.'s Surreply at 12–13 (No. 11-2073).

Whether or not there are other shared drives beyond the "I-Drive" and "S-Drive," however, is a red herring.  Ultimately, the FBI has averred that "[g]iven the broad search of the comprehensive CRS system and the ELSUR indices . . . [the FBI's acting FOIA chief] determined that there is no reasonable basis to conclude that responsive records are reasonably likely to be located by further searches of shared drives."  Second Argall Decl. ¶ 9(b).  This conclusion is entitled to "a presumption of good faith," *SafeCard*, 926 F.2d at 1200, despite the fact that its reasoning for why searches of shared drives would be unlikely to uncover responsive records is quite cursory.[15]  Although the agency's justification for not searching shared drives is thin, Mobley's argument for why shared drives *are* likely to contain responsive records is even thinner.  As discussed above, Mobley's purported bases for requiring a search of all shared drives are either conclusory or unsupported, and therefore they are insufficient to rebut the presumption that the FBI's averments are in good faith.  Therefore, Mobley's argument that the FBI's search was inadequate for failing to search all shared drives must fail.

In sum, all of Mobley's challenges to the adequacy of the FBI's search for responsive records are insufficient to defeat the FBI's entitlement to summary judgment on this issue.

---

[15] The Court could speculate as to why this is so.  For instance, shared drives may be unlikely to contain responsive materials due to their particular location or specialized function, or perhaps shared drives contain records that are duplicative of files contained in the CRS and the ELSUR databases.

### B.      The Propriety of the Defendants' *Glomar* Response

The next category of issues raised by the plaintiffs is the propriety of the DIA and the

CIA issuing *Glomar* responses to the plaintiffs' FOIA/PA requests.  A Glomar response is "an

exception to the general rule that agencies must acknowledge the existence of information

responsive to a FOIA request and provide specific, non-conclusory justifications for withholding

that information." *Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1178 (D.C. Cir. 2011).  Thus, a

*Glomar* response allows an agency to respond to a FOIA request by neither confirming nor

denying the existence of any records responsive to the request, on the grounds that "confirming

or denying the existence of records would itself 'cause harm cognizable under a[] FOIA

exception.'"  *Id.* (quoting *Wolf*, 473 F.3d at 374).

### 1.      *CIA*

As discussed above, the CIA notified the plaintiffs, in response to their FOIA/PA request

that "[w]ith respect to responsive records that would reveal a classified connection to the CIA . . .

the CIA can neither confirm nor deny the existence or nonexistence of records responsive to your

request."  Second Meeks Decl. Ex. 3, at 1.  The plaintiffs challenge this *Glomar* response on

three grounds:  (1) the CIA officially acknowledged the existence of responsive records that

would reveal a classified affiliation with the plaintiffs, and thus it waived its ability to issue a

*Glomar* response; (2) the CIA improperly invoked FOIA Exemption 1 to support its *Glomar*

response; and (3) the CIA improperly invoked FOIA Exemption 3 to support its *Glomar*

response.

### a)      *The CIA Did Not "Waive" Its Ability to Issue a Glomar Response.*

The plaintiffs' first argument is premised on what the CIA has referred to as an

"inaccurac[y]" or "error" in its initial, September 20, 2011, response to the plaintiffs' request.

*See* First Meeks Decl. ¶¶ 13, 22.  As discussed previously, this initial letter stated that "we were

able to locate responsive material."  Second Meeks Decl. Ex. 3, at 1.  The amended response

letter, however, which was sent over three months later, on January 11, 2012, admitted that "our

initial response letter contained inaccuracies regarding our search," and it went on to state that

the CIA was "unable to locate any information or records" after "search[ing] for CIA-originated

responsive records that might reflect an open or otherwise acknowledged Agency affiliation."

Second Meeks Decl. Ex. 4, at 1.  In its brief, the CIA's only explanation for this about-face was

that it was "based on an internal misunderstanding," though the nature of that misunderstanding

is unclear.  Defs.' Mem. in Supp of Defs.' Mot. for Summ. J. ("Defs.' Mem.") at 11 n.2, ECF

No. 22 (No. 11-2072).

   The plaintiffs contend that this "misunderstanding" is "[o]ne of the key issues" that is "at

the core of CIA's processing of Plaintiffs' FOIA/PA requests."  Pls.' Opp'n at 2 (No. 11-2072).

They argue that, because there is no evidence to establish "that the 'mistake' was truly an

innocent administrative error that should have no consequences," there "is a genuine issue of

material fact regarding the nature of CIA's 'mistake' and the appropriate consequences for the

agency," which preclude summary judgment on this issue.  *Id.* at 11.  Despite this restrained

framing, the bottom line of the plaintiffs' argument on this issue is that the "CIA waived its right

to issue a *Glomar* response" because the CIA officially acknowledged the existence of

responsive records.  *Id.* at 6, 8–9.

   The fundamental error in the plaintiffs' argument, however, as the defendants point out,

is that "plaintiffs have made no argument that the CIA's initial response actually disclosed [the

relevant] Glomar fact," *i.e.*, the fact that "records revealing a classified connection between

plaintiffs and the CIA" existed.  Defs.' Reply at 6 (No. 11-2072).  In order to constitute an

"official acknowledgement" of information that waives an agency's ability to issue a *Glomar*

response, "the information requested must be as specific as the information previously released,"

the "information requested must match the information previously disclosed," and "the information requested must already have been made public through an official and documented disclosure." *Wolf*, 473 F.3d at 378 (quoting *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990)). "In the *Glomar* context, then, if the prior disclosure establishes the *existence* (or not) of records responsive to the FOIA request, the prior disclosure necessarily matches both the information at issue—the existence of records—and the specific request for that information." *Id.* at 379. In this case, the prior disclosure, *i.e.*, the initial September 20, 2011, response letter, only disclosed that the CIA was "able to locate responsive material," and the context of the letter clearly conveyed that this "responsive material" was limited to responsive records that would reveal an *unclassified* connection to the CIA. *See* Second Meeks Decl. Ex. 3, at 1; First Meeks Decl. ¶ 22 (stating that the CIA "mistakenly claimed that the CIA was withholding [records reflecting an unclassified relationship with Plaintiffs]"). This implication was clear because in the very next paragraph, the letter stated that the CIA could neither confirm nor deny the existence of "responsive records that would reveal a *classified* connection to the CIA." Second Meeks Decl. Ex. 3, at 1 (emphasis added). Any other reading of this letter would be nonsensical because it would entail reading the letter to state simultaneously that the CIA both *refused to confirm* and *confirmed* the existence of responsive records reflecting a classified connection to the CIA.

Since the Court interprets the CIA's initial response letter to not have established the existence or nonexistence of responsive records that would reveal a classified connection to the CIA, the CIA did not waive its ability to issue a *Glomar* response to those records.

> b)   The CIA's Invocation of FOIA Exemption 1 to Issue a Glomar
>       Response Was Procedurally Sound.

In addition to their waiver argument, the plaintiffs contend that "CIA's invocation of

[FOIA] Exemption (b)(1) fails for both a procedural and a substantive reason."  Pls.' Opp'n at 12

(No. 11-2072).[16]  Procedurally, the plaintiffs argue that "CIA has not demonstrated that it

followed the appropriate steps when determining that the fact of the existence or nonexistence of

responsive records . . . is classified."  *Id.*  The parties refer to "the fact of the existence or

nonexistence of responsive records" as the "*Glomar* fact."  *See id.* at 12; *see also* Defs.' Reply at

6 (No. 11-2072).  In the plaintiffs' view, "[a] *Glomar* fact is itself a piece of information," and

therefore "since [Executive Order 13,526] establishes a uniform system for classifying

information . . . an agency must follow the Order's procedures when classifying an intangible

piece of information as a *Glomar* fact just as it would when classifying a document."  Pls.'

Opp'n at 12–13 (11-2072) (emphasis omitted).  Hence, under the plaintiffs' argument, "the

classification of the *Glomar* fact is improper" because the CIA did not properly classify that fact

under Executive Order 13,536, *id.*, and therefore the CIA was not permitted to issue its *Glomar*

response under FOIA Exemption 1, which only applies to classified information and information

"specifically authorized under criteria established by an Executive order to be kept secret in the

interest of national defense or foreign policy," 5 U.S.C. § 552(b)(1).

The CIA responds that plaintiffs improperly "equate the 'Glomar fact' with every other

document that an agency classifies pursuant to the Executive Order" because "an agency's

Glomar response is fundamentally different in nature, as it arises solely in the context of a

response to a request for records."  Defs.' Reply at 8 (No. 11-2072).  In contrast to the plaintiffs,

---

[16] FOIA Exemption 1 provides that "matters that are" either "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy" or "are in fact properly classified pursuant to such Executive order" are exempt from production under the FOIA.  *See* 5 U.S.C. § 552(b)(1).

the CIA takes the position that "the Glomar response is merely a response to a request for records, not a classified record itself."  *Id.*  In this same vein, the CIA contends that the plaintiffs' position is in conflict with well-settled FOIA law.  In particular, the CIA argues that since a *Glomar* determination "does not exist independently of the original request for the responsive records" and because "[p]laintiffs' argument would effectively require CIA to create [a] single piece of paper and apply classification markings every time it [issues a *Glomar* response]," the plaintiffs' argument violates the principle that "FOIA 'does not obligate agencies to create or retain documents.'"  *Id.* at 8–9 (quoting *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 152 (1980)).

Executive Order 13,526 "prescribes a uniform system for classifying, safeguarding, and declassifying national security information" and recognizes that "throughout our history, the national defense has required that certain information be maintained in confidence in order to protect our citizens, our democratic institutions, our homeland security, and our interactions with foreign nations."  Exec. Order No. 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009).  It provides that "information may be originally classified" if four conditions are met:

> (1) an original classification authority is classifying the information;
>
> (2) the information is owned by, produced by or for, or is under the control of the United Stated Government
>
> (3) the information falls within one or more of the categories of information listed in section 1.4 of this order; and
>
> (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security . . . and the original classification authority is able to identify or describe the damage.

*Id.* § 1.1(a).  Also, at the time that information is originally classified, a number of items must also "be indicated in a manner that is immediately apparent," such as the classification level, the "agency and office of origin," the date for declassification, and a "concise reason for

classification." *Id.* § 1.6; *see also id.* § 1.5 (requiring original classification authority to

"establish a specific date or event for declassification" of classified information).  Additionally,

although the ability to issue a *Glomar* response in response to a FOIA request was first

established through the case law of this Circuit, *see Phillippi v. CIA*, 546 F.2d 1009, 1012–13

(D.C. Cir. 1976), Executive Order 13,526 also specifically permits agencies to issue *Glomar*

responses.  *See* Exec. Order 13,526 § 3.6(a) ("An agency may refuse to confirm or deny the

existence or nonexistence of requested records whenever the fact of their existence or

nonexistence is itself classified under this order or its predecessors.").  In this case, the plaintiffs

complain that the CIA has failed to present evidence that it satisfied certain requirements for

proper administrative handling of classified information under Executive Order 13,526, namely,

establishing when the *Glomar* fact was classified and when it will be declassified.  *See* Pls.'

Opp'n at 13 (No. 11-2072).[17]

     The resolution of this issue is complicated first by the fact that both sides find significant

support for their respective positions.  The plaintiffs' position is supported by the text of

Executive Order 13,526, which clearly states that "[a]t the time of original classification," the

classifying authority must, *inter alia*, indicate when the information will become declassified.[18]

*See* Exec. Order 13,526 §§ 1.5–1.6.  This is in keeping with the Executive Order's

pronouncement that "[n]o information may remain classified indefinitely."  *Id.* § 1.5(d).  The

CIA, on the other hand, finds support for its position in the law of this Circuit and the Supreme

---

[17] The plaintiffs do not appear to contest that the CIA satisfied the requirements of Executive Order 13,526 § 1.1(a), which contains the four threshold requirements for properly classifying a piece of information.  Rather, the plaintiffs challenge the CIA's compliance with Executive Order 13,526 §§ 1.5–1.6, which contain certain requirements for the administrative handling of information once it is classified.

[18] Executive Order 13,526 does not, however, require that a classifying authority indicate when information is originally classified.  *See, e.g.*, *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 857 F. Supp. 2d 44, 58 (D.D.C. 2012) (observing that "[Executive Order] 13526 does not require that the date of classification be indicated on the records themselves").

Court, which have held that "FOIA does not require an agency to 'create or retain' documents." *Bureau of Nat'l Affairs, Inc. v. U.S. Dep't of Justice*, 742 F.2d 1484, 1493 (D.C. Cir. 1984); *accord Kissinger*, 445 U.S. at 152.  There is more than a little tension between these two principles:  Compliance with Executive Order 13,526, in the context of a *Glomar* response, would appear to require agencies to create a record in response to a FOIA request (*i.e.*, a piece of paper that contains all classification markings required by the Executive Order), *see* Defs.' Reply at 8–9 (No. 11-2072); Pls.' Surreply at 4 (No. 11-2072), and yet agencies are generally not required to create records in response to a FOIA request.

This issue is complicated further by the fact that, although Executive Order 13,526 ostensibly applies to all "national security information"—tangible or intangible—the Order's requirements regarding a date of declassification clearly presume that such information has already been reduced into a tangible medium, such as a document or other type of record.  For example, section 1.5 of the Order, which requires a classification authority to "establish a specific date or event for declassification," speaks of "information" being "marked" and at one point interchangeably uses the words "information" and "document."  *See* Exec. Order 13,526 § 1.5.  Furthermore, section 1.6 of the Order, which requires certain classification markings, states that all such markings "shall be indicated in a manner that is immediately apparent" and also uses the words "document" and "record" as synonyms for "information."  *See id.* § 1.6.  The Order's implicit assumption that all classified information is in a tangible form is fundamentally incompatible with the nature of a *Glomar* response, which is "an intangible piece of information."  Pls.' Opp'n at 12 (No. 11-2072); *see also Phillipi*, 546 F.2d at 1013 ("When the [CIA]'s position is that it can neither confirm nor deny the existence of the requested records, there are no relevant documents for the court to examine other than the affidavits which explain the [CIA]'s refusal.").  This dilemma highlights the uniqueness of *Glomar* responses:  Not only

34

are *Glomar* responses intangible forms of classified information, but the CIA is correct that they are also "fundamentally different in nature" than other classified information because they "arise[] solely in the context of a response to a request for records."  Defs.' Reply at 8 (No. 11-2072).  For these reasons, and also because it would be contrary to longstanding FOIA law to require agencies to create records in response to FOIA requests, the Court holds that, in order to issue a *Glomar* response, an agency need not create or maintain any tangible records.

Even so, the question remains whether an agency must establish a timeline for the declassification of a *Glomar* fact in order to issue a *Glomar* response under FOIA Exemption 1, assuming that such a timeline could be established without the need to create tangible records.  On the one hand, the plaintiffs are correct that a fundamental precept of classifying sensitive information is that "[n]o information may remain classified indefinitely."  Exec. Order 13,526 § 1.5(d).  The Court, however, concludes that the requirement in Executive Order 13,526 to establish a declassification timeline is not an absolute prerequisite to classifying information.  Rather, a timeline for declassification and other classification markings are only required once information has already been properly classified.  *Compare* Exec. Order 13,526 § 1.1(a) (setting forth "conditions" under which "[i]nformation may be originally classified"), *with id.* §§ 1.5–1.6 (requiring certain actions to be taken "[a]t the time of original classification").  Thus, although an agency may not be in full compliance with Executive Order 13,526 by failing to establish a declassification timeline for *Glomar* facts, that failure does not prevent the agency from relying on FOIA Exemption 1 to issue a *Glomar* response to a FOIA request.

This reading of Executive Order 13,526 is supported by cases from within this Circuit, in addition to the language and structure of the Order itself.  For example, in *Wolf*, the D.C. Circuit held that, under Executive Order 12,958—the predecessor of Executive Order 13,526, which contained identical requirements for a declassification timeline—"if the [agency] [a]ffidavit

plausibly explains the danger [of the expected damage to national security or foreign relations from confirming or denying the existence of records], the existence of records *vel non* is properly classified under Executive Order 12958 and justifies the Agency's invocation of Exemption 1." *Wolf*, 473 F.3d at 375–76.  Other decisions from within this Circuit have similarly indicated that an agency need only satisfy the requirements of Executive Order § 1.1(a) to classify information properly for purposes of FOIA Exemption 1, which the CIA has done with respect to its *Glomar* response in the instant action.  *See Mobley v. Dep't of Justice*, 870 F. Supp. 2d 61, 66 (D.D.C. 2012); *Schoenman v. FBI*, 841 F. Supp. 2d 69, 81 (D.D.C. 2012); *Am. Civil Liberties Union v. Dep't of Justice* ("*ACLU/DOJ I*"), 808 F. Supp. 2d 280, 298 (D.D.C. 2011) ("Information can be properly classified under Executive Order 13526 if [the] four requirements [of § 1.1(a) are met . . . ."); *see also* First Meeks Decl. ¶¶ 29–30 (averring compliance with requirements of Executive Order 13,529 § 1.1(a)).  Therefore, the Court concludes that the CIA is not required to establish a declassification timeline in order to "properly classif[y]" a *Glomar* fact under Executive Order 13,526.

        *c)*     *The CIA's Invocation of FOIA Exemption 1 to Issue a Glomar Response Was Substantively Justified.*

        Having resolved the plaintiffs' procedural challenge to the CIA's *Glomar* response under FOIA Exemption 1, the Court will now discuss the plaintiffs' substantive challenge.  In this regard, the plaintiffs take issue with the CIA's justification for invoking FOIA Exemption 1 to issue its *Glomar* response.  The CIA explains its justification as follows:  First, "if the CIA admits that it possesses covert intelligence information about a particular individual, the CIA essentially admits that one or more of his activities have been detected by the CIA." First Meeks Decl. ¶ 37.  "Such an acknowledgement alerts this individual that he must take countermeasures to make his future activities undetectable by the CIA."  *Id.*  On the other hand, "if the CIA denies

that it possesses intelligence information about a particular individual who indeed should be of intelligence interest to the CIA, the CIA essentially admits to the individual that his efforts to conceal his activities have been successful" and thus "this individual would know that he could continue to act with impunity." *Id.* ¶ 38.  Due to this conundrum, "the mere confirmation or denial of the existence of any other responsive records would reveal a classified fact: namely, whether the CIA has maintained covert relationships with Plaintiffs or whether the CIA has gathered intelligence on Plaintiffs." *Id.* ¶ 27.

The plaintiffs argue, however, that this justification does not apply to Mobley because he is not and "should not be of intelligence interest to the U.S. Intelligence Community."  Pls.' Opp'n at 15 (No. 11-2072).  The plaintiffs contend, in a highly conclusory fashion, that Mobley "clearly is not undertaking any 'activities,' and so does not fit into this [first] category" and "[a]s for the second category, the 'efforts to conceal his activities' that have been successful so far consist entirely of not doing anything wrong." *Id.* at 14 (emphasis omitted).  The plaintiffs' only support for this argument is an internal e-mail chain from three individuals at a private intelligence think tank called Stratfor, which was obtained from an unauthorized release of documents by the organization WikiLeaks.  *See id.* at 16; *see also* Pls.' Mot. for Status Conf. Regarding Use of Potentially Classified Information at 1, ECF No. 26 (No. 11-2072).[19]  That e-mail chain states, *inter alia*, that "[Mobley] was not part of [al-Qaeda in the Arabian Peninsula]. Security simply picked him up on suspicions and his shady affiliations."  Pls.' Opp'n Ex. D at 1, ECF No. 40-4 (No. 11-2072).  Based on this e-mail, the plaintiffs argue that "the Court should

---

[19] The Government has assured the Court that "it is unnecessary to treat as presumptively classified here an unofficial, non-government document obtained from the public domain," and therefore "the Government has no objection to the filing of this email on the public record."  Defs.' Objection to June 22, 2012 Order at 1–2, ECF No. 32 (No. 11-2072).

find that there is a genuine issue of material fact regarding whether or not Mobley should be of intelligence interest to CIA." Pls.' Opp'n at 16 (No. 11-2072).

This argument need not detain the Court long. The CIA is correct to argue that "plaintiffs' argument misunderstands both the Glomar response and the scope of the information that CIA's Glomar response seeks to protect." Defs.' Reply at 11 (No. 11-2072). As the CIA explains, even if the plaintiffs were correct (*i.e.*, that Mobley has done nothing wrong and should not be of intelligence interest to the CIA), "CIA could not acknowledge as much in this case and then issue Glomar responses in those cases in which the agency *did* have responsive records or the person *was* an intelligence source or target of the United States," because "such responses over time would effectively reveal who is and is not an intelligence source or target." *Id.* Hence, the very nature of the *Glomar* posture requires that agencies categorically refuse to either confirm or deny the existence of responsive records that would reflect a classified or unacknowledged affiliation with a person because confirmation or denial that such records exist has the potential to harm national security, in and of itself. The plaintiffs ask the Court to require the CIA to "attest that Mobley was or should have been a subject of intelligence interest," in order for the CIA to be entitled to summary judgment, Pls.' Surreply at 5 (No. 11-2072), but this once again misunderstands the purpose of a *Glomar* response. As the CIA logically explains, the CIA may simply not know that a given person should be of intelligence interest at any given time, which is precisely why *Glomar* responses must be categorical. *See* Defs.' Reply at 12–13 (No. 11-2072) ("Among the numerous people in the world who CIA does not target for collection at any particular time, CIA cannot possibly know for certain who might seek to harm the United States (and who would thus make malicious use of CIA's confirmation that it has no records about them) and who is completely benign . . . .").

To the extent that the plaintiffs ask this Court to second-guess the CIA's statements by finding on its own "that Plaintiffs should not have been of intelligence interest," Pls.' Opp'n at 16 (No. 11-2072), their request is inappropriate.  As the D.C. Circuit has held, "in the FOIA context, we have consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review."  *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 927 (D.C. Cir. 2003).  "The CIA's arguments need only be both 'plausible' and 'logical' to justify the invocation of a FOIA exemption in the national security context."  *ACLU/DOD*, 628 F.3d at 624 (quoting *Wolf*, 473 F.3d at 374–75).  The plaintiffs' purported evidence is insufficient to create a genuine issue of material fact on this issue because it is not the Court's proper place to decide who should or should not be the subject of intelligence gathering activities, and even if the Court were required to decide such questions, the unsworn opinions of non-governmental actors (*e.g.*, private-sector intelligence analysts) carry little or no weight in that calculus.  The Court concludes that the CIA's explanation for its *Glomar* response in the instant case, recited above and in sworn affidavits, is both plausible and logical, and therefore the CIA was justified in issuing a *Glomar* response to the plaintiffs under FOIA Exemption 1.[20]

### 2.    *DIA*

Mobley challenges the DIA's *Glomar* response with arguments identical to those raised against the CIA's *Glomar* response.  First, Mobley argues that, as a procedural matter, "DIA has not demonstrated that it followed the appropriate steps when determining that the fact of the existence or nonexistence of responsive records . . . is classified."  Pl.'s Opp'n at 3 (No. 11-2073).  Second, Mobley contends that the DIA's substantive justification for its *Glomar* response

---

[20] Although the plaintiffs also raise objections to the CIA's invocation of FOIA Exemption 3 to justify its *Glomar* response, *see* Pls.' Opp'n at 16–27 (No. 11-2072), the Court need not resolve those objections because the Court concludes that the CIA's *Glomar* response was justified independently under FOIA Exemption 1.

under FOIA Exemption 1 is illogical because "Mobley should not be of intelligence interest to the U.S. Intelligence Community." *Id.* at 5–8. These arguments fail as to the DIA for the same reasons these arguments failed as to the CIA. *See supra* Part III.B.1(b)–(c). The DIA has logically explained in a sworn affidavit that the "*Glomar* fact" at issue—whether responsive records exist revealing a classified or otherwise unacknowledged relationship with Mobley—is properly classified under Executive Order 13,526. Therefore, the DIA's *Glomar* response was appropriate.[21]

## C.   The Propriety of the Defendants' Withholding Determinations

The next area in which the plaintiffs challenge the defendant agencies' responses is regarding the agencies' determinations to withhold certain responsive records or portions thereof. All four of the defendants decided to withhold certain responsive records (or portions thereof), and so the Court will discuss each agency's withholding decisions in turn.

### 1.   *CIA*

The Court will begin by discussing the withholding decisions of the CIA. As discussed above, the DIA referred several responsive records to the CIA, and the CIA released all but six of those records to Mobley. The six records were withheld in full under FOIA Exemption 3, which exempts from disclosure all records "specifically exempted from disclosure by statute" as long as that statute either "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue" or "establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3); *see also* Third Meeks Decl. ¶ 7 ("The Agency determined that the remaining six records must be denied in full on the basis of FOIA exemption (b)(3).").

---

[21] Once again, although Mobley also raises objections to the DIA's invocation of FOIA Exemption 3 to justify its *Glomar* response, *see* Pl.'s Opp'n at 8–12 (No. 11-2073), the Court need not resolve those objections because the Court concludes that the DIA's *Glomar* response was justified independently under FOIA Exemption 1

a)    *FOIA Exemption 3:  National Security Act*

In this regard, the CIA has cited two statutes that it says independently justify its

invocation of FOIA Exemption 3:  the National Security Act of 1947 and the Central Intelligence

Agency Act of 1949 (the "CIA Act").  Section 102A(i)(1) of the National Security Act provides

that "[t]he Director of National Intelligence shall protect intelligence sources and methods from

unauthorized disclosure."  50 U.S.C. § 403-1(i)(1).  Additionally, Section 6 of the CIA Act

provides that "the [CIA] shall be exempted from . . . the provisions of any other law which

requires the publication or disclosure of the organization, functions, names, official titles,

salaries, or numbers of personnel employed by the [CIA]."  50 U.S.C. § 403g.  The CIA states

that the six records at issue "reveal certain sensitive but unclassified intelligence sources and

methods," and therefore they are protected by the National Security Act because "Executive

Order 12,333 charges the CIA with carrying out [the National Security Act's] directive" and are

also exempt under the CIA Act because "Open Source Intelligence ('OSINT') is a core function

of the CIA."  Third Meeks Decl. ¶¶ 9, 12–13.

Mobley objects to the CIA's reliance on both statutes as grounds to invoke FOIA

Exemption 3, and the Court will begin by discussing the National Security Act.  With respect to

that statute, Mobley objects that the CIA is not authorized to invoke the National Security Act

for purposes of the FOIA because that statute only gives authority to the Director of National

Intelligence ("DNI") to protect intelligence sources and methods, not the CIA.  *See* Pl.'s Opp'n

at 12–13 (No. 11-2073); *see also id.* at 8–12.[22]  Following this logic, Mobley focuses on an

amendment to the National Security Act that was passed as a part of the Intelligence Reform and

---

[22] The Court will cite to Mobley's arguments as to the DIA's invocation of the National Security Act because Mobley incorporates that discussion by reference in opposing the CIA's invocation of the National Security Act. *See* Pl.'s Opp'n at 12 (No. 11-2073) ("For the same reason that DIA is not authorized to independently invoke the National Security Act without delegation of authority from ODNI, CIA may not do so either.").

Terrorism Prevention Act ("IRTPA") in 2004. The IRTPA created the DNI, and it vested that position with the authority, *inter alia*, to protect intelligence sources and methods. *See generally* Pub. L. No. 108-458 §§ 1001–1011, 118 Stat. 3638, 3643–62 (2004). Prior to this amendment, the National Security Act provided that the Director of Central Intelligence ("DCI") had the responsibility to "protect intelligence sources and methods from unauthorized disclosure." *See* 50 U.S.C. § 403-3(c)(6) (2000). Mobley argues that the IRTPA amendments transferred the authority to protect intelligence sources and methods from the DCI to the DNI, and therefore "any other agency seeking to invoke [the National Security Act] to withhold records under Exemption (b)(3) must be expressly authorized to do so by that office." Pl.'s Opp'n at 9 (No. 11-2073).

In making this argument, Mobley relies heavily on three cases, two of which are from this Circuit. First, Mobley cites *Talbot v. CIA*, 578 F. Supp. 2d 24 (D.D.C. 2008), in which the State Department presented an express authorization from the DNI to support its argument that it could invoke the National Security Act. The court stated in a footnote that "[t]he [National Security Act] requires the Director of National Intelligence ('DNI')—not the State Department— to protect intelligence sources and methods. The DNI did exactly that when he requested the State Department take all necessary and appropriate measures to ensure the protection of intelligence sources and methods." *Id.* at 29 n.3. Next, Mobley cites *National Institute for Military Justice v. Department of Defense* ("*NIMJ*"), 404 F. Supp. 2d 325 (D.D.C. 2005) (Walton, J.), *aff'd*, 512 F.3d 677 (D.C. Cir. 2008), which dealt with the Department of Defense's reliance on a different statute—10 U.S.C. § 130c—to invoke FOIA Exemption 3. In *NIMJ*, the statute at issue specifically provided that only three cabinet-level officers had the ability to designate documents to be withheld: the Secretary of Defense, the Secretary of Homeland Security, and the Secretary of Energy. *See NIMJ*, 404 F. Supp. 2d at 337. Since the Department

42

of Defense's affiant was not one of those three individuals, the court held that the defendant did

not have the authority to invoke the statute.  *See id.* at 337–38.  Mobley argues that the Court

should "follow the lead of Judge Walton and hold that absent a proper delegation of authority

from ODNI, [other agencies] may not invoke the National Security Act as a withholding statute."

Pl.'s Opp'n at 10 (No. 11-2073).  Finally, Mobley cites *Amnesty International USA v. CIA*, 728

F. Supp 2d 479, 501 (S.D.N.Y. 2010), which stated that "[t]he amendments made by the IRTPA

transferred the authority for protecting intelligence from the Director of the CIA to the DNI."

Mobley reasons that, since "[a]uthority can only be transferred if the original holder does not

retain it," the CIA was essentially stripped of its authority to invoke the National Security Act on

its own by virtue of the IRTPA.  *See* Pl.'s Opp'n at 13 (No. 11-2073).

  The CIA responds that "the DNI need not personally authorize every agency's

withholding of intelligence sources and methods information pursuant to the National Security

Act."  Defs.' Reply at 9 (No. 11-2073).  Rather, the CIA contends that "[t]he DNI's duty to

protect intelligence sources and methods . . . requires implementation of general measures

designed to ensure that *all* members of the intelligence community prevent unauthorized

disclosure of such information."  *Id.*  The CIA argues that "under both the current statute and its

predecessor, this Circuit and other courts have upheld other intelligence community agencies'

invocation of the National Security Act to protect intelligence sources and methods."  *Id.* at 9–10

(collecting cases).  In particular, the CIA draws the Court's attention to the D.C. Circuit's

decision in *Larson v. Department of State*, 565 F.3d 857, 868–69 (D.C. Cir. 2009), which upheld

the National Security Agency's authority to withhold certain records under FOIA Exemption 3

under three statutes, including the provision of the National Security Act relied on by the CIA in

the instant case.

The CIA has the better of the argument on this point.  In addition to *Larson*, another D.C. Circuit case cited by the CIA, which Mobley has chosen not to address, upheld the CIA's reliance upon 50 U.S.C. § 403-1(i)(1) to invoke FOIA Exemption 3 where the withheld information qualified as "intelligence sources and methods."  *See ACLU/DOD*, 628 F.3d at 618–26.[23]  Although the Circuit did not specifically address the argument made by Mobley regarding the authority of non-DNI agencies to protect intelligence sources and methods, the Court is bound to follow the Circuit's interpretation of the CIA's authority to rely upon the National Security Act in invoking FOIA Exemption 3.  Mobley's reliance on dicta or the interpretation of different statutes in district court cases is simply insufficient to displace the Circuit's holding in *ACLU/DOD*, which was handed down only two years ago.  Therefore, the Court holds that the CIA has the authority to rely upon the National Security Act, 50 U.S.C. § 403-1(i)(1), to invoke FOIA Exemption 3 to withhold responsive records.  *See ACLU/DOD*, 628 F.3d at 626 (holding that "the government properly invoked FOIA exemption[] . . . 3" under the National Security Act, 50 U.S.C. § 403-1(i)(1)); *accord Larson*, 565 F.3d at 865; *ACLU/DOJ I*, 808 F. Supp. 2d at 289 n.2 ("Although § 403-1(i)(1) of the [National Security Act] provides that the 'Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure,' the CIA may rely upon this statutory provision to withhold records under FOIA." (citing *Larson*, 565 F.3d at 865)).[24]

> b)      *Privacy Act Exemption*

Mobley also objects that "CIA has made no claim that these OSC records are not located in a system of records or are exempt under the Privacy Act."  Pl.'s Opp'n at 18 (No. 11-2073).

---

[23] The plaintiffs have not contested the CIA's assertion that the withheld records contain "intelligence sources and methods" as that term is used in the National Security Act.

[24] Since the Court holds that the CIA had the authority to rely upon the National Security Act to invoke FOIA Exemption 3 and withhold responsive records, the Court need not address whether the CIA properly relied upon the CIA Act, in the alternative, to withhold those same responsive records.

The CIA explains that, because the six OSC records were located by the DIA, "the relevant question for purposes of the Privacy Act is whether they were located in a DIA system of records, and if so, whether that system of records has been exempted from the access provisions of the Privacy Act." Defs.' Reply at 14 (No. 11-2073). The defendants cite the Court to the DIA's second sworn declaration, which explains that the 41 OSC records (including the six withheld records) "were located in DIA's Web Intelligence Search Engine ('WISE') database," which is "DIA's repository for electronic message traffic, holding in excess of 60 million such messages addressed to or originating from DIA." Second Decl. of Alesia Y. Williams ("Second Williams Decl.") ¶ 4, ECF No. 50-1 (Oct. 12, 2012) (No. 11-2073). Ms. Williams, the DIA's FOIA chief, explains that the WISE database is not a Privacy Act "system of records" because "DIA does not organize records in WISE by individuals who may be mentioned in those records, nor does DIA retrieve records about individuals from that database by use of an individual's name or personal identifier as a matter of practice." *Id.*

Mobley, however, submits two objections to the DIA's explanation. First, he argues that, since the records originated in the OSC, the Court must determine whether the OSC is a "Privacy Act system of records." Pl.'s Surreply at 9 (No. 11-2073). Second, he contends that, even assuming that the WISE database is the proper database to consider for Privacy Act purposes, the WISE database should be considered a system of records because "the evidence suggests that these records are compiled for investigatory purposes," which, according to Mobley, strongly suggests that they are being kept as a system of records. *Id.* at 10–11.[25] Both of these arguments are unpersuasive. First, even if Mobley is correct that the relevant question is whether these

---

[25] Mobley also suggests to the Court that the DIA's affiant is misleading the Court by averring that it is not the DIA's usual practice to retrieve information from the WISE system by an individual's name. *See* Pl.'s Surreply at 10 n.8 (No. 11-2073). Mobley fails, however, to present one iota of evidence that would suggest that the DIA has given the Court this information in bad faith.

records were maintained in a CIA Privacy Act system of records, any portion of such a system of records that contained the withheld OSC records would be exempt from the Privacy Act.  This is because the Privacy Act permits the head of the CIA to exempt, by rule, any system of records "maintained by the Central Intelligence Agency."  5 U.S.C. § 552a(j)(1).  The CIA has, in turn, published a rule that exempts from the Privacy Act "those portions and only those portions of all systems of records maintained by the CIA that . . . [c]onsist of, pertain to, or would otherwise reveal intelligence sources and methods."  32 C.F.R. § 1901.62(d).  Since the Court has already concluded that the six withheld OSC records would reveal intelligence sources or methods, *see supra* Part III.C.1(a), those records are also necessarily exempt from the disclosure provisions of the Privacy Act.

Furthermore, Mobley has presented no evidence that would create a genuine issue of material fact regarding whether the WISE database is a "system of records."  The DIA's explanation regarding the WISE database is logical and is entitled to presumption of good faith. *See, e.g.*, *SafeCard*, 926 F.2d at 1200 (holding that "[a]gency affidavits are accorded a presumption of good faith").  All that Mobley offers to rebut the DIA's explanation is the unsupported assertion that "[t]he evidence suggests that these records are compiled for investigatory purposes."  Pl.'s Surreply at 10 (No. 11-2073).  Mobley's only "evidence" in support of this assertion consists of the conclusory statement that the WISE system "includes open source media reports about intelligence targets," and therefore "[i]t defies credulity that [such a] system . . . would not be searched for information about said targets."  *Id.* at 10 n.8.  Ms. Williams's declaration, however, establishes that the WISE database contains "electronic message traffic," including electronic messages that circulate open-source intelligence publications to "elements of the U.S. Intelligence Community on a daily basis."  Second Williams Decl. ¶ 4.  Since the WISE database is essentially a database of e-mail messages, some

of which are messages containing "open source media articles," *id.*, it is logical that such messages would not be organized by the name or personal identifying information of individuals discussed in such articles, and Mobley has offered no evidence to contradict this explanation.[26] *See, e.g.*, *Krieger v. U.S. Dep't of Justice*, 529 F. Supp. 2d 29, 42–43 (D.D.C. 2008) (holding that e-mails were not part of "system of records" under Privacy Act where plaintiff "offer[ed] no facts suggesting that [records] would have been indexed by name, or that an electronic folder existed that grouped emails related to him by name or other identifier"). As a result, the CIA is entitled to summary judgment on the issue of whether the six withheld OSC records are exempt from disclosure under the Privacy Act.

### 2.    *State Department*

Next, the Court will discuss the withholding determinations of the State Department. In total, State withheld 117 documents in whole or in part under a variety of FOIA and Privacy Act exemptions. State has indexed and explained its reasons for withholding this material in the sworn declaration of Sheryl Walter, who is Director of the Office of Information Programs and Services ("IPS") at State. *See* First Walter Decl. ¶ 1. The plaintiffs raise five categories of objections to State's withholding determinations, which the Court will discuss in turn.

#### a)    *Privacy Act Systems of Records*

The plaintiffs first argue that State "improperly applied the Privacy Act." Pls.' Opp'n at 29 (No. 11-2072). In particular, the plaintiffs contend that State's determination that "even though some records were clearly records about Plaintiffs, information *within* those records was not subject to the Privacy Act" was wrong. *Id.* at 30. In support of its determination, State cites

---

[26] In the interest of transparency, the DIA publicly lists all of its Privacy Act systems of records on the Department of Defense's website, and the WISE database is not listed. *See* Def. Privacy & Civil Liberties Office, System of Records Notices, Def. Intelligence Agency, http://dpclo.defense.gov/privacy/sorns/component/dia/index.html (last visited Feb. 6, 2013).

the D.C. Circuit's holding that, when materials pertain to both a Privacy Act requester and other individuals from whom the agency has received no written consent permitting disclosure, the Privacy Act's prohibition on disclosing information without written consent "must take precedence," and the portions of the record pertaining to those third parties must be withheld. *See Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1121 n.9 (D.C. Cir. 2007); *see also* Defs.' Reply at 24 (No. 11-2072).  The plaintiffs do not discuss the Circuit's holding in *Sussman*, but rather point to a district court case decided several years before *Sussman*, where the court declined to hold that "information contained in one individual's record is exempt from the disclosure requirements of the Privacy Act simply because the same information is also contained in another individual's records."  *Henke v. Dep't of Commerce*, No. 94-0189, 1996 WL 692020, at *4 (D.D.C. Aug. 19, 1994), *aff'd*, 83 F.3d 1445 (D.C. Cir. 1996).  Whatever weight the *Henke* decision might otherwise have, its reasoning did not survive the Circuit's clear holding in *Sussman*.  Therefore, the plaintiffs are not entitled to the information contained in certain State documents that is about third-party individuals who have not given their written consent to have their information disclosed.

### b)      FOIA Exemption 1

Next, the plaintiffs take issue with State's invocation of FOIA Exemption 1 with respect to twenty-two documents, in whole or in part, which the plaintiffs say "is supported only by conclusory allegations of unspecified harm or expectations of confidence."  Pls.' Opp'n at 38 (No. 11-2072).  Specifically, the plaintiffs contend that a number of documents were not properly classified under Executive Order 13,526, based on the statements made in Ms. Walter's declarations.  *See id.* at 39.

The plaintiffs' first argument in this regard is that "the record does not support a finding that [certain records withheld under FOIA Exemption 1] are properly classified according to

E.O. 13526 § 1.7(d)."  *Id.*  Section 1.7(d) of the Executive Order provides a procedure for

classifying documents after they have been requested through the FOIA or the Privacy Act.  In

that situation, a record may only be classified "if such classification meets the requirements of

this order and is accomplished on a document-by-document basis with the personal participation

or under the direction of the agency head, the deputy agency head, or the senior agency official

designated under section 5.4 of this order."  Exec. Order 13,526 § 1.7(d).  Based on the

requirements of section 1.7(d), the plaintiffs contend that Ms. Walter does not have the authority

to classify documents under that section "on her own."  Pls.' Opp'n at 39 (No. 11-2072).  State

responds by citing to a State Department regulation that officially authorizes the Deputy

Assistant Secretary for Records and Publishing Services "to be the official to classify

information on a document-by-document basis."  Bureau of Administration; Classification

Authority Acting Under the Direction of the Senior Agency Official, 64 Fed. Reg. 7227 (Feb. 12,

1999).  The plaintiffs, however, contend that section 1.7(d) requires the agency head, deputy

agency head, or senior agency official to "make [a document-by-document classification]

determination or direct another to do so *each time* such classification is desired and for each

document," because "State cannot be allowed to reduce [section 1.7(d)] to mootness by simply

publishing a single Notice in the *Federal Register* and then forgetting about it."  Pls.' Opp'n at

40 (No. 11-2072).

  The Court disagrees with the plaintiffs' cramped reading of Executive Order 13,526.

Nothing in the text of the Order evinces any intent to require the senior agency official to direct

others to make document-by-document classification determinations "each time such

classification is desired and for each document."  *Id.* (emphasis omitted).  The Order simply

states that the document-by-document classification of records subject to section 1.7(d) must be

done "under the direction of the agency head, the deputy agency head, or the senior agency

official." Exec. Order 13,526 § 1.7(d).  Absent any affirmative evidence that the Executive

Order intended to prohibit delegation of the authority to perform this document-by-document

classification, the delegation is presumptively permissible.  *See NLRB v. Duval Jewelry Co. of*

*Miami*, 357 U.S. 1, 7 (1958) ("[T]he law does not preclude practicable administrative procedure

in obtaining the aid of assistants in the department." (internal quotation marks omitted)); *U.S.*

*Telecom Ass'n v. FCC*, 359 F.3d 554, 565 (D.C. Cir. 2004) ("When a statute delegates authority

to a federal officer or agency, a subdelegation to a subordinate federal officer or agency is

presumptively permissible absent affirmative evidence of a contrary congressional intent."); *see*

*also Darui v. U.S. Dep't of State*, 798 F. Supp. 2d 32, 42 (D.D.C 2011) (upholding authority of

subordinate officer in State Department to classify documents under E.O. 13,526 § 1.7(d)).

Therefore, the Court concludes that State complied with Executive Order 13,526 § 1.7(d) when it

established that Margaret Grafeld, the Deputy Assistant Secretary for Global Information

Services (formerly Records and Publishing Services), "personally considered" the withheld

portions of the three documents contested by the plaintiffs and determined that their

classification needed to be upgraded after Mobley had already filed his FOIA/PA request.  *See*

Supplemental Decl. of Sheryl L. Walter ("Second Walter Decl.") ¶¶ 23–25, ECF No. 49-5 (No.

11-2072).[27]

    Second, the plaintiffs argue that State has not convincingly demonstrated that a number

of documents were properly classified under Executive Order 13,526 § 1.4(b) as "foreign

government information."  *See* Pls.' Opp'n at 41–43 (No. 11-2072).  Foreign government

information includes "information provided to the United States Government by a foreign

---

[27] The Court notes for the purpose of clarity that the plaintiffs mischaracterized the State Department's position in their brief by stating that State was "attempt[ing] to claim that the Director of the [IPS] can satisfy [the] requirement[s] [of E.O. 13,526 § 1.7(d)] on her own."  Pls.' Opp'n at 39.  State never made such a contention, but instead argued that *Ms. Grafeld* was able to satisfy the requirements of E.O. 13,526 § 1.7(d) on her own.

government or governments, an international organization of governments, or any element thereof, with the expectation that the information, the source of the information, or both, are to be held in confidence." Exec. Order. 13,526 § 6.2(s). The plaintiffs complain that State withheld portions of three documents pursuant to section 1.4(b) without sufficiently explaining why the material was conveyed with an expectation of confidence. *See* Pls.' Opp'n at 42–43 (No. 11-2072). The plaintiffs also contend that State has not "provide[d] any factual reasons that the Court should find the existence of an implied grant [of confidentiality]" and that "State's entire argument appears to be based on the questionable philosophy that *all* exchanges of information between foreign government officials and the United States come with implied grants of confidentiality." *Id.* at 42.

In the declarations of Ms. Walter, she explains that the information withheld as foreign government information "reveals observations and concerns expressed in confidence" and other "sensitive information" relayed to the U.S. Government by various Yemeni officials. *See* Second Walter Decl. ¶¶ 23–25. Ms. Walter further explains that this information was all provided "with an expectation of confidentiality" because, absent such an expectation, "foreign government officials (such as the Yemenis here) would be unwilling to share this kind of confidential information with Department officials if this kind of information were required to be released publicly under FOIA." *Id.* ¶¶ 23–24; *see also id.* ¶ 25 (explaining that "[t]his type of information would not have been provided absent an expectation of confidentiality, and the Department will be unable to obtain such confidences from foreign officials in the future if such officials fear that this kind of information may be compelled to be released publicly"). The State Department's explanation of why this information was conveyed in confidence is both logical and plausible, considering the nature of the information, and courts within this Circuit have consistently upheld the State Department's invocation of FOIA Exemption 1 with respect to

51

similar information.  *See, e.g.*, *Am. Civil Liberties Union v. Dep't of State*, 878 F. Supp. 2d 215, 222 (D.D.C. 2012) (upholding State's withholding information "concerning, among other things, discussions, assessments, or recommendations relating to bilateral affairs with, or the policies, political situation, or security situation" of various nations); *Abuhouran v. U.S. State Dep't*, 843 F. Supp. 2d 73, 79 (D.D.C. 2012); *Darui*, 798 F. Supp. 2d at 40–41 (upholding State's withholding of a "letter from the Ambassador of Saudi Arabia to the United States"); *Gov't Accountability Project v. U.S. Dep't of State*, 699 F. Supp. 2d 97, 102 (D.D.C. 2010).

Upholding the State's withholding of such information in the instant case does not necessarily endorse the sweeping principle that "all exchanges of information between foreign government officials and the United States come with implied grants of confidentiality."  Pls.' Opp'n at 42 (emphasis omitted).  Rather, Ms. Walter's sworn declaration sufficiently explains why confidentiality is paramount when it comes to the particular information contained in the documents at issue, *i.e.*, the "observations and concerns" expressed by foreign officials to the United States.  *See* Second Walter Decl. ¶¶ 23–25.  Ms. Walter's declaration supports the principle that, in the often fragile arena of foreign relations, an implied understanding of confidentiality is necessary to ensure that nations can communicate their impressions, concerns, negotiating positions, or other sensitive matters without fear that those matters will then be publicly disclosed.  Thus, the Court concludes that State properly classified the three documents at issue under Executive Order 13,526 § 1.4(b).

Finally, the plaintiffs argue that information withheld from two documents was improperly classified pursuant to Executive Order 13,526 § 1.4(g), which allows for the classification of information related to "vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to national security."  *See* Pls.' Opp'n at 44 (No. 11-2072); *see also* Exec. Order 13,526 § 1.4(g).  The Court need not decide

this question to grant summary judgment to State, however, because the information at issue is classified under both sections 1.4(g) and 1.4(d) of Executive Order 13,526.  *See* Second Walter Decl. ¶¶ 132, 149.  Thus, even if the information were not properly classified under section 1.4(g) as the plaintiffs contend, the plaintiffs do not dispute that the same information is properly classified under section 1.4(d).

c)      <em>Privacy Act Exemption (d)(5)</em>

The plaintiffs next challenge State's decision to withhold certain information under Privacy Act Exemption (d)(5), which forbids requesting parties from accessing "any information compiled in reasonable anticipation of a civil action or proceeding."  5 U.S.C. § 552a(d)(5); *see also* Pls.' Opp'n at 32–38 (No. 11-2072).  The plaintiffs "concede that the challenged information was compiled in anticipation of a civil action or proceeding," but they contend instead that "such anticipation was not reasonable."  Pls.' Opp'n at 32 (No. 11-2072) (emphasis omitted).  Within this argument, the plaintiffs cite three specific aspects of State's invocation of Exemption (d)(5) that they believe are improper.  First, the plaintiffs argue that State "falsely claims that 'Mobley had in fact already brought suit against the U.S. Government, alleging that the Government had unlawfully arranged his detention,'" even though Mobley did not file any suit against the Government before filing the instant actions.  *See id.* at 33.  Second, the plaintiffs contend that certain information was improperly withheld from one document because the information consisted of an attorney's advice about potential testimony given in a case to which the State Department was not a party, which the plaintiffs say is not covered by Exemption (d)(5).  *Id.* at 33–34.  Third, the plaintiffs more generally contend that State's evidence to support a reasonable anticipation of a civil action or proceeding "falls far short of the 'foreseeability' standard that governs the objective component of 'reasonable anticipation' for the simple reason

that it would be impossible for Plaintiffs to bring an adversarial action against any federal official, agency, or other entity for the reasons State allegedly fears." *Id.* at 34.

Privacy Act Exemption (d)(5) "speaks of 'information,' a term that embraces facts as easily as it does deliberative processes" and therefore "does not admit of any distinction between" the two and "in no way incorporates civil discovery law." *Martin v. Office of Special Counsel*, 819 F.2d 1181, 1187 (D.C. Cir. 1987).  The exemption "protects documents prepared in anticipation of quasi-judicial administrative hearings" as well as "actions in the district courts." *See id.* at 1188.  The exemption also extends to "investigatory documents" the creation of which is "premised on the possibility that prohibited practices will be uncovered, thereby warranting further action," even if no proceedings are in fact initiated.  *Gov't Accountability Project v. Office of the Special Counsel*, No. 87-235, 1998 WL 21394, at *4 (D.D.C. Feb. 22, 1998).

As to the plaintiffs' first argument under Exemption (d)(5), State concedes that it was incorrect to assert that Mobley had already initiated litigation against the Government prior to filing the instant FOIA/PA actions.  *See* Defs.' Reply at 27 n.11 (No. 11-2072).  Rather, "[t]he statements should have said that at least some State Department employees *believed* that litigation was then ongoing, based on various news reports then circulating." *Id.* (citing Second Walter Decl. ¶¶ 18–19).  It appears that this dispute only applies to one document, but the Court concludes that State has presented sufficient evidence to demonstrate that the information withheld from this document is exempt from disclosure under Exemption (d)(5).  Ms. Walter explains that, at or around the time that these documents were created, one of Mobley's attorneys was repeatedly contacting various members of the State Department as well as consular officers. *See* Second Walter Decl. ¶ 17.  Additionally, "various media entities were reporting on potential and/or ongoing litigation between Mr. Mobley and the [State] Department," and so "State Department employees perceived that litigation was ongoing and felt the need to coordinate with

both the Office of the Legal Adviser and with the Department of Justice."  *Id.* ¶¶ 18–19.  This

evidence is sufficient to demonstrate that the information withheld from the document at issue,

No. O47, was "compiled in reasonable anticipation of a civil action or proceeding."  5 U.S.C.

§ 552a(d)(5).

The plaintiffs' second objection to State's (d)(5) withholdings stands on firmer ground,

but is likewise unavailing.  The document at issue in that objection, No. O119, is "an email chain

among Sana'a consular officers and Department of State officials in Washington," which

discusses the possibility of State Department personnel testifying in an unspecified proceeding

that related to Mobley.  *See* First Walter Decl. ¶¶ 62–63; Pls.' Opp'n Ex. E at 10–11, ECF No.

40-5 (No. 11-2072).  The material withheld under Exemption (d)(5) "concerns preliminary

advice from Department of State attorneys to their client in the Office of Overseas Citizens

Services concerning the possibility of consular officers testifying at the request of Mr. Mobley's

attorney."  First Walter Decl. ¶ 63.  The plaintiffs say in their opposition that this unspecified

proceeding was one "to which the agency would not be a party," Pls.' Opp'n at 34 (No. 11-2072)

(emphasis omitted), which is consistent with the released portions of the document and is

uncontested by State.

Even assuming that the withheld information was information prepared in anticipation of

a proceeding to which State was a non-party, however, Privacy Act Exemption (d)(5) still

applies.  Although some authorities suggest that the traditional, discovery-based work-product

privilege excludes materials prepared by non-parties to litigation, *see, e.g.*, *In re Cal. Pub. Utils.

Comm'n*, 892 F.2d 778, 781 (9th Cir. 1989) (holding that Federal Rule of Civil Procedure

26(b)(3) "limits its protection to one who is a party (or a party's representative) to the litigation

in which discovery is sought"), Privacy Act Exemption (d)(5) is broader than the traditional

work-product privilege and "in no way incorporates civil discovery law."  *Martin*, 819 F.2d at

1187; *see also, e.g., Hernandez v. Alexander*, 671 F.2d 402, 408 (10th Cir. 1982) ("[Privacy Act Exemption (d)(5)] is not confined to a work-product privilege, but was meant to afford the broad protection its terms imply." (citing *Smiertka v. U.S. Dep't of Treasury*, 447 F. Supp. 221, 227–28 (D.D.C. 1978))).   Therefore, it is reasonable to interpret Exemption (d)(5) to include "any information compiled in reasonable anticipation of a civil action or proceeding" that is prepared by either a potential party to such a proceeding or by a potential *material participant* in that same proceeding.   Particularly when, as here, such information contains the mental impressions of an attorney concerning potential testimony in an anticipated proceeding, it makes no difference whether the recipient of those impressions is a party to the proceeding.   All that matters for purposes of Exemption (d)(5) is that the information was "compiled in reasonable anticipation of a civil action or proceeding."   *See* 5 U.S.C. § 552a(d)(5).

Finally, the plaintiffs' third argument challenging State's Exemption (d)(5) withholdings misunderstands the test for determining what constitutes a "reasonable anticipation of a civil action or proceeding."   *Id.*   The plaintiffs reason that State's anticipation of litigation was unreasonable simply because the type of litigation anticipated would be highly unlikely to succeed.   *See* Pls.' Opp'n at 34–37 (arguing that anticipated claims "would be impossible for Plaintiffs to bring," and would be, *inter alia*, "precluded by the Alien Tort Claims Act," "doomed to failure," "without a case," or "explicitly exclude[ed]" by certain statutes).   Yet, the legal merits (or lack thereof) of an anticipated litigation are not the standard by which courts measure the reasonableness of a party's anticipation.   Rather, the reasonableness of a party's anticipation of litigation is measured by, *inter alia*, the objective probability that litigation will be *initiated*, not the probability that such litigation, once initiated, will succeed.   *See, e.g., Willingham v. Ashcroft*, 228 F.R.D. 1, 5 (D.D.C. 2005) (anticipation of litigation was reasonable where plaintiff "initiated an adversarial action against the agency" and plaintiff would "likely

56

*bring* litigation in the District Court" (emphasis added)).  The plaintiffs ask the Court to assume

too much by arguing that it is unreasonable for parties, particularly government agencies, to

anticipate the potential filing of meritless or unsuccessful lawsuits.  Such lawsuits are filed every

day.  Hence, State is correct to point out that a contrary rule "would make attorneys . . . fear that

they should not record their candid thoughts, advice, or impressions until they first determined

that any feared lawsuit would be meritorious."  Defs.' Reply at 26 (No. 11-2072).  The Court

thus concludes that the plaintiffs' objections to State's withholding under Privacy Act Exemption

(d)(5) are unavailing, and therefore State is entitled to summary judgment as to those

withholdings.

*d)*      *FOIA Exemptions 6 and 7(C)*

The plaintiffs originally raised a number of objections to State's withholdings pursuant to

FOIA Exemptions 6 and 7(C).  *See* Pls.' Opp'n at 44–46 (No. 11-2072).  They later clarified,

however, that they were withdrawing their objections to withholdings in seven of the eight

documents about which they originally complained.  *See* Errata at 1–2, ECF No. 48 (No. 11-

2072).  The plaintiffs' only remaining objection to State's withholdings under FOIA Exemptions

6 and 7(C) relate to an internal inconsistency in Ms. Walter's original declaration, which was

discussing State's inadvertent withholding of Ms. Islam's passport number from a responsive

record.  *See* Defs.' Reply at 31 n.15 (No. 11-2072).  The statement at issue reads as follows:

"Ms. Islam's passport number is inadvertently withheld.  Release of this passport number would

constitute a clearly unwarranted invasion of her personal privacy.  It is therefore exempt from

release under FOIA exemption (b)(6)."  First Walter Decl. ¶ 147.

The plaintiffs latch on to this inconsistency to argue that it "is indicative of something far

more insidious—Walter did not even review this statement before she signed it."  Pls.' Opp'n at

45 (No. 11-2072).  The plaintiffs then go on to accuse Ms. Walter of "simply cut[ting] and

57

past[ing] from other locations without any thought to whether or not the specific information being withheld warranted such protection." *Id.* at 45–46.  In this way, the plaintiffs openly concede that they challenge State's response regarding this document, not because they substantively contend that the inadvertent withholding was improper, but rather "to prove a point, namely, that State's assertions of Exemptions (b)(6) and (b)(7)(C) were not made with any significant degree of attention," and therefore the deference normally owed to Ms. Walter's declaration regarding withholding decisions "must suffer."  *See id.*  Ms. Walter explains that the latter two sentences of the portion of her declaration quoted above "were inadvertently left in the final declaration," and she clarifies that "I carefully reviewed the declaration and each of the withheld documents prior to signing, and any insinuation to the contrary is flatly wrong." Second Walter Decl. ¶ 27.

Ms. Walter's inconsistency, which the plaintiffs admit was "a minor error" in a 67-page, 200-paragraph declaration, *see* Pls.' Surreply at 11 n.7, does not have the sweeping consequences for which the plaintiffs advocate.  The only situation in which the Court would withhold a presumption of good faith as to a sworn agency declaration is if the plaintiffs were able to present contrary evidence of *bad faith.  See, e.g.*, *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981).  The inconsistency in Ms. Walter's declaration is not evidence of bad faith, nor is it indicative of "a general sloppiness in the declassification or review process." *See Afshar v. Dep't of State*, 702 F.2d 1125, 1131 (D.C. Cir. 1983).  Indeed, considering the very limited nature of the apparently inadvertent oversight and Ms. Walter's subsequent explanation of the oversight, the Court is satisfied that there is no reason to revoke the presumption of good faith and substantial deference generally accorded to sworn agency affidavits in FOIA cases.

*e)*     *FOIA Exemption 7(E)*

Finally, the plaintiffs challenge the State's decision to withhold certain information under

FOIA Exemption 7(E), which covers "records or information compiled for law enforcement

purposes" that "would disclose techniques and procedures for law enforcement investigations or

prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if

such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C.

§  552(b)(7)(E); *see also* Pls.' Opp'n at 46–48 (No. 11-2072).  The plaintiffs contend that

"[d]efendants have not met their burden of adequately demonstrating that the controverted

information pertains to law enforcement methods unknown to the public," which courts have

held is a requirement for exemption under Exemption 7(E).  *See* Pls.' Opp'n at 47 (No. 11-2072);

*see also*, *e.g.*, *Nat'l Whistleblower Ctr. v. Dep't of Health & Human Servs.*, 849 F. Supp. 2d 13,

36 (D.D.C. 2012) ("Exemption 7(E) thus generally protects those law-enforcement techniques

and procedures that are 'not well-known to the public.'" (quoting *Judicial Watch, Inc. v. U.S.*

*Dep't of Commerce*, 337 F. Supp. 2d 146, 181 (D.D.C. 2004))).

The State Department has clarified, however, that "all of the information that has been

withheld pursuant to Exemption 7(E) relates to either law enforcement techniques that are

altogether unknown to the public, or to specific details of law enforcement techniques that are

publicly known."  Defs.' Reply at 29 (No. 11-2072).  This position is supported by Ms. Walter's

second sworn declaration, which also provides the example of one particular law enforcement

technique cited by the plaintiffs:  what are known as "name checks."  *See* Second Walter Decl.

¶ 30; *see also* Pls.' Opp'n at 47 ("The Court should be especially suspicious of the suggestion

that a simple 'Name Check' is an unknown technique.").  Ms. Walter explains that "[w]hile the

public may generally be aware that 'name checks' are conducted, the withheld information

consists of sensitive details about such name check databases or procedures that are not publicly

known." Second Walter Decl. ¶ 30.  In light of this clarification, the Court finds that the

information withheld by State under FOIA Exemption 7(E), if disclosed, "could reasonably be

expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E); *see also, e.g.*, *Showing*

*Animals Respect & Kindness v. U.S. Dep't of Interior*, 730 F. Supp. 2d 180, 199–200 (D.D.C.

2010); *Blanton v. U.S. Dep't of Justice*, 63 F. Supp. 2d 35, 49–50 (D.D.C. 1999).  Therefore,

State is entitled to summary judgment as to the propriety of those withholdings.

  In summary, all of the plaintiffs' arguments challenging State's withholding decisions are

insufficient to overcome the justifications put forward by the agency, and the State Department is

therefore entitled to summary judgment regarding each piece of information withheld under the

FOIA and the Privacy Act.

  **3.**  ***OPMG***

  In addition to their objections to information withheld by the State Department, the

plaintiffs also object to the determination of the Office of the Provost Marshal General

("OPMG") to withhold twelve documents in their entirety, eleven of which were referred to the

OPMG by State.  *See* Pls.' Opp'n at 49–51 (No. 11-2072); Pl.'s Opp'n at 18–20 (No. 11-2073).

The OPMG's justifications for withholding these records is not completely clear from the

information available on the public docket.  The OPMG's sworn declarant, John Hargitt, states

that all twelve documents are properly classified under Executive Order 13,526, and therefore

are exempt from disclosure under FOIA Exemption 1 and Privacy Act Exemption (k)(1).  *See*

First Hargitt Decl. ¶¶ 6–7; Second Hargitt Decl. ¶¶ 7–8.  Mr. Hargitt further explains that, due to

the twelve documents' "highly sensitive and classified nature," he "cannot publicly describe

these records or articulate the basis for their classification in greater detail than I have here."

First Hargitt Decl. ¶ 8; *see also* Second Hargitt Decl. ¶ 9.  To explain the OPMG's justification

for withholding these documents in more detail, Mr. Hargitt has submitted two additional sworn

declarations to the Court, *ex parte* and *in camera*.  *See* Notice of Ex Parte, In Camera Filing, ECF No. 37 (No. 11-2072); Notice of Ex Parte, In Camera Filing, ECF No. 44 (No. 11-2073).

Due to the limited amount of information available to the plaintiffs about the OPMG's withholdings, the plaintiffs have offered three potential ways in which the OPMG's withholdings may have been improper.  First, the plaintiffs contend that it is unclear when these documents became classified and, if they were not classified until after the plaintiffs' FOIA/PA request, the OPMG was required to comply with Executive Order 13,526 § 1.7(d), as discussed previously. *See* Pls.' Opp'n at 50 (No. 11-2072); Pl.'s Opp'n at 18 (No. 11-2073); *see also supra* Part III.C.2(b).  Depending on what is stated in Mr. Hargitt's *in camera* declarations, the plaintiffs argue therefore that "these classification determinations may not satisfy the procedural requirements of E.O. 13526 § 1.7."  Pls.' Opp'n at 50 (No. 11-2072).  Second, the plaintiffs theorize that "the information in these records may not properly meet the requirements of E.O. 13526 § 1.4, especially if it is claimed to be 'foreign government information.'"  *Id.*  Finally, the plaintiffs contend more broadly that since "the evidence does not explain why OPMG possesses records about Plaintiffs in the first place . . . its maintenance of such records appears to be in violation of its mandate."  *Id.*  The plaintiffs base this contention on the fact that neither of the plaintiffs "is or has ever been a member of the U.S. military . . . had any relationship to the Army or in fact any other military branch . . . . is or has ever been in military custody or the subject of a military investigation . . . . [or] is or has ever been an Enemy Prisoner of War or Detainee."  *Id.* at 50–51.

After reviewing the *ex parte*, *in camera* declarations of Mr. Hargitt, the Court is satisfied that the records withheld by the OPMG were properly classified under Executive Order 13,526 and were subject to the OPMG's mandate.  Thus, all of the plaintiffs' proffered objections to the OPMG's decision to withhold these records are unavailing.

### 4.   *FBI*

Lastly, the Court will discuss Mobley's objections to the withholding determinations of

the FBI.  As discussed above, the FBI located eighty-five pages of records responsive to

Mobley's FOIA/PA request, and it withheld portions of those records pursuant to one or more of

the following:  FOIA Exemptions 1, 6, and 7(C); and PA Exemption (j)(2).  *See* First Argall

Decl. ¶ 24.

### a)   *Prior Disclosure*

Mobley's first challenge to the FBI's withholdings has to do with a single, three-page

document, which Mobley says was previously officially disclosed publicly and therefore "not

subject to withholding under any exemption."  Pl.'s Opp'n at 24 (No. 11-2073).  Mobley asserts

that the document in question "was provided in full by FBI to the Yemeni government, who then

provided it to a private party in Yemeni court, who then filed it on the court record."  *Id.*

"[W]hen information has been 'officially acknowledged,' its disclosure may be

compelled even over an agency's otherwise valid exemption claim."  *Fitzgibbon v. CIA*, 911

F.2d 755, 765 (D.C. Cir. 1990).  "[A]lthough an agency bears the burden of proving that a FOIA

exemption applies to a given document, a plaintiff asserting that information has been previously

disclosed bears the initial burden of pointing to specific information in the public domain that

duplicates that being withheld."  *Pub. Citizen v. Dep't of State*, 11 F.3d 198, 201 (D.C. Cir.

1993) (citing *Afshar*, 702 F.2d at 1130).  In order to constitute an official acknowledgement, "the

information requested must," *inter alia*, "already have been made public through an official and

documented disclosure" because "in the arena of intelligence and foreign relations there can be a

critical difference between official and unofficial disclosures."  *Fitzgibbon*, 911 F.2d at 765.

In response to Mobley's argument, the FBI has explained, through the sworn declaration

of Dennis Argall, the acting FOIA chief at the FBI, that there are several reasons to conclude that

the document in question was not officially released by the FBI.  First, "the FBI has no evidence indicating that the document was provided by the FBI to the Yemeni Government" and "[t]he FBI only learned that this document had somehow been released in unredacted form after Plaintiff's Counsel brought it to the FBI's (and this Court's) attention."  Second Argall Decl. ¶ 10.  Mr. Argall further explains that "[t]he FBI does not authorize the disclosure of FBI information by foreign countries without approval from designated FBI officials," yet "the FBI has no record that any such approval or release authorization was provided for this document." *Id.*  Finally, Mr. Argall states that "[a]n authorized document release by the FBI to a foreign government would bear appropriate FBI dissemination control markings," but the unredacted version of the document in question, obtained by Mobley's counsel, contains no such classification or other restriction markings.  *Id.*

Mobley does not contest the FBI's statements regarding the absence of appropriate FBI dissemination control markings or the absence of any FBI records documenting official approval or authorization for the release of the document in question.  Rather, Mobley insists that the FBI must establish that it has completed its official investigation into how this document found its way into the hands of the Yemeni government before the Court may grant the FBI summary judgment on this issue.  *See* Pl.'s Surreply at 13–14 (No. 11-2073).  The final results of the FBI's investigation are essentially irrelevant, however, so long as the FBI has been able to definitively establish that it did not officially disclose this document to the Yemeni government.  Mr. Argall's statements in his sworn declaration are sufficient to conclude that there was no official disclosure of the document in question, primarily due to the absence of two fundamental indicia of official disclosure, *i.e.*, appropriate dissemination control markings on the document itself, and internal records documenting approval for an official disclosure.  These indicia are important because the D.C. Circuit has made clear that, in order to constitute an official acknowledgement

that waives the protections of FOIA exemptions, a disclosure must be both "official" and

"*documented*."  *Fitzgibbon*, 911 F.2d at 765 (emphasis added).  Mobley's bare allegations that

the FBI was the Yemeni government's source for the document in question are insufficient to

overcome the evidence presented by the FBI to the contrary.  Therefore, the Court concludes that

the document in question was not officially disclosed, and thus the FBI has not waived its ability

to claim FOIA exemptions as to that document. [28]

> b)      *Privacy Act Exemption (j)(2)*

Next, Mobley takes issue with the FBI's invocation of Privacy Act Exemption (j)(2) to

withhold portions of certain responsive records.  That exemption provides that agencies may

exempt any system of records from the Privacy Act, which is "maintained by an agency or

component thereof which performs as its principal function any activity pertaining to the

enforcement of criminal laws."  5 U.S.C. § 552a(j)(2).  The FBI has, pursuant to Privacy Act

Exemption (j)(2), promulgated a rule that exempts, *inter alia*, the Central Records System

("CRS") and the ELSUR indices.  *See* 28 C.F.R. § 16.96.  Mobley attempts to sidestep the FBI's

exemption of these systems of records by arguing, without citation to any authority, that records

contained in the CRS are only exempt from the disclosure provisions of the Privacy Act "when

---

[28] Mobley has also submitted "new evidence" in the form of two letters consisting of a FOIA request by his attorney that sought information related to the FBI's investigation of how this classified document was disseminated to the Yemeni government and ultimately to Mobley's attorney, as well as the FBI's letter responding to that request.  *See* Pl.'s Mot. for Leave to File Additional Evidence, ECF No. 57 (No. 11-2073).  Over the FBI's objection, the Court granted Mobley leave to submit this "new evidence."  *See* Minute Order dated Jan. 30, 2013.  The FBI stated that all records responsive to this request were withheld under FOIA Exemption 7(A) because "[t]he records responsive to [Mobley's counsel's] request are law enforcement records" and "there is a pending or prospective law enforcement proceeding relevant to these responsive records."  *See* Pl.'s Mot. for Leave to File Additional Evidence Ex. I, ECF No. 57-2 (No. 11-2073).  Mobley contends that this correspondence is "evidence that FBI has acknowledged that it has not completed the investigation into how the undersigned came into possession of this document, and, accordingly, that any assertions made on that issue by Defendants are pure speculation unsupported by any evidence."  Pl.'s Mot. for Leave to File Additional Evidence at 2 (No. 11-2073).  Mobley's argument is essentially that, because the FBI's investigation regarding the dissemination of the classified document is still ongoing, the FBI has no basis to contend that the document was not officially disclosed to the Yemeni government.  Yet, this argument is clearly incorrect.  The FBI has indeed presented evidence, discussed above, that the document in question was not officially disclosed, and whether or not the FBI has determined the non-FBI source of the document's dissemination is irrelevant.

the records pertain to a legitimate law enforcement mission."  Pl.'s Opp'n at 27 (No. 11-2073).

From this proposition, Mobley contends that "the mission claimed by FBI for [17 documents

under Exemption (j)(2)] is *not* a legitimate law enforcement mission."  *Id.*

The FBI follows Mobley down this primrose path, defending its law enforcement mission

as a legitimate one, *see* Defs.' Reply at 21 (No. 11-2073), but such a defense is unnecessary.

The language of Exemption (j)(2) clearly permits agencies, including the FBI, to exempt entire

systems of records from the Act's disclosure provisions, and the only precondition for such an

exemption is that the agency or component that maintains the system must "perform[] as its

principal function any activity pertaining to the enforcement of criminal laws."  5 U.S.C.

§ 552a(j)(2).  Therefore, the FBI is not required to justify any particular law enforcement mission

implicated by a particular document, so long as the document in question was located in a system

of records that has been properly exempted from the disclosure provisions of the Privacy Act.[29]

*See, e.g.*, *Marshall v. FBI*, 802 F. Supp. 2d 125, 134 (D.D.C. 2011) (holding that "CRS records

are exempt from disclosure under the Privacy Act" and thus "the Privacy Act does not require

that the FBI release any of the records kept in the CRS").  The restriction that Mobley attempts

to place on the FBI's power to withhold information from exempted systems of records has no

support in the statutory language or case law, and hence the FBI is entitled to summary judgment

on this issue.

   c)   *FOIA Exemption 1*

Mobley next objects to the FBI's withholding of certain information under FOIA

Exemption 1, reciting many of the same arguments that he used to challenge the State

Department's invocation of that same exemption.  *See supra* Part III.C.2(b).  In other words,

---

[29] Mobley does not contest that the CRS, where the documents in question were located, is exempt from the disclosure provisions of the Privacy Act.  *See* Pl.'s Opp'n at 27 (No. 11-2073).

Mobley argues that "FBI's invocation of Exemption (b)(1) is improper both procedurally and substantively."  Pl.'s Opp'n at 27 (No. 11-2073).  Procedurally, Mobley contends that "the information was not properly classified in accordance with E.O. 13526 § 1.7(d), as it was classified after receipt of Mobley's FOIA/PA request by someone who was not the 'senior agency official.'"  *Id.*  This is the same non-delegation argument raised by the plaintiffs in challenging the State Department's invocation of FOIA Exemption 1.  *See supra* Part III.C.2(b). Since the Court has already rejected this argument with respect to the State Department, *see id.*, and because the FBI has established that the authority to classify information under Executive Order 13,526 § 1.7(d) has been properly delegated to the official who classified the documents at issue here, *see* Second Argall Decl. ¶¶ 12–15, the Court likewise rejects Mobley's argument with respect to the FBI.

 Substantively, Mobley states that he "is functionally unable to provide any specific arguments against FBI's withholdings" because the FBI was unable to provide a full explanation for its withholding decisions on the public record.  *See* Pl.'s Opp'n at 29 (No. 11-2073); First Argall Decl. ¶ 44.  In lieu of a more extensive objection, Mobley simply states that "if the Court were to inspect pages M-79 and M-80 *in camera*, it would find information classified in violation of E.O. 13526 § 1.7, not to mention information that is not redacted elsewhere in the release." Pl.'s Opp'n at 29 (No. 11-2073).  Mobley also argues that "the information in the released records may not properly meet the requirements of E.O. 13526 § 1.4, especially if it is claimed to be 'foreign government information.'"  *Id.*  In the end, because the FBI is unable to provide a more detailed explanation on the public record, Mobley asks the Court to "closely scrutinize all the FBI documents to ensure that they meet the strict requirements of E.O. 13526 § 1.4 and reject any conclusory assertions in Defendants' *ex parte*, *in camera* filing."  *Id.* at 30.

To further explain the agency's withholding decisions pursuant to FOIA Exemption 1, the FBI has "submitted the classified Ex Parte, In Camera Declaration of Dennis J. Argall." *See* Notice of Ex Parte, In Camera Filing, ECF No. 26 (No. 11-2073). After reviewing that *ex parte*, *in camera* declaration, the Court has concluded that the relevant records were properly classified pursuant to Executive Order 13,526, and therefore these records were properly withheld from disclosure under FOIA Exemption 1. Since the Court concludes that the sworn *ex parte*, *in camera* declaration submitted by the FBI is sufficient to uphold the FBI's withholding decisions under FOIA Exemption 1, the Court need not review the documents themselves *in camera*, as Mobley suggests. *See, e.g.*, *Hayden v. NSA*, 608 F.2d 1381, 1387 (D.C. Cir. 1979) ("When the agency meets its burden by means of affidavits, *in camera* review is neither necessary nor appropriate.").

### d)       *FOIA Exemptions 6 and 7(C)*

The final area of FBI exemptions challenged by Mobley are those made pursuant to FOIA Exemptions 6 and 7(C). FOIA Exemption 6 protects from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). FOIA Exemption 7(C) protects from disclosure "records or information compiled for law enforcement purposes" that "could reasonably be expected to constitute an unwarranted invasion of personal privacy." *Id.* § 552(b)(7)(C). There is a great deal of overlap between these two exemptions, and thus the Court will discuss them together.

The FBI withheld three categories of information from responsive records under FOIA Exemptions 6 and 7(C), all of which Mobley says were withheld improperly: "(1) Information regarding FBI Special Agents and support personnel; (2) Information regarding third parties merely mentioned; and (3) Information regarding foreign law enforcement personnel." Pl.'s

Opp'n at 31 (No. 11-2073).  With respect to the first category, Mobley contends that the "FBI

has no authority to withhold other federal employees' names, and some of these withholdings are

of such names."  *Id.*  As to the second category, Mobley states that certain information redacted

from one of the FBI records contains the names of people authorized to receive records about

Mobley.  *See id.*  Mobley clarifies that his objection to this withholding is that "information

being withheld was previously released and therefore not subject to withholding" because the

names redacted from the FBI records were "included in a privacy waiver that the State

Department released to Mobley."  Pl.'s Surreply at 16 (No. 11-2073).  Finally, with respect to

category three, Mobley objects to the withholding of the name of "the guard whom Mobley

allegedly killed" because "it is well-established that the guard is deceased," Pl.'s Opp'n at 31

(No. 11-2073), and therefore "there is no privacy interest in the mere mention of the deceased

guard's name," Pl.'s Surreply at 16 (No. 11-2073).

Taking each set of objections in turn, the Court will first address Mobley's objection to

the first category of withheld information.  At its core, Mobley's argument as to the first category

of information is remarkably hyper-technical:  He does not dispute that release of the redacted

names would be a clearly unwarranted invasion of personal privacy, and he does not contend that

there is any countervailing public interest in releasing the withheld names.  In truth, Mobley does

not even really question the FBI's authority, as a general matter, to withhold the names of non-

FBI personnel under FOIA Exemptions 6 and 7(C).  All that Mobley argues is that the "FBI's

only justification for withholding these names is that they were 'Names and/or Identifying

Information of FBI Special Agents and Support Personnel.'"  Pl.'s Surreply at 15 (citing First

Argall Decl. ¶¶ 48–50).  He goes on to argue that the "FBI cannot now change its argument to

include non-FBI personnel when the only relevant justification in its sworn declarations applies

solely to FBI personnel."  *Id.*  Mobley's argument, however, is unavailing.  It is simply untrue

that "the only relevant justification in [the FBI's] sworn declaration applies solely to FBI personnel." *Id.*  Although it is true that the primary focus of the FBI's justification was FBI Special Agents, Mr. Argall's sworn declaration states, *inter alia*, that individuals subjected to law enforcement actions "may seek revenge on the agents *and other federal employees* involved in a particular investigation."  First Argall Decl. ¶ 48 (emphasis added).  It is for this reason, among others, that the FBI determined that release of names and personal identifying information would constitute a clearly unwarranted invasion of personal privacy.  *See id.*  The FBI's justification surely encompasses any federal employees that were involved in the interview of Mobley, including any non-FBI personnel, and therefore Mobley's objection to the first category of documents is fatally flawed.

Mobley's objection to the second category of documents is essentially an argument that the State Department has already official disclosed the names of all of the individuals authorized to receive records about Mobley, and therefore the FBI has no authority to withhold that information under the FOIA.  *See* Pl.'s Surreply at 16 (No. 11-2073) ("Mobley's argument was merely that the information being withheld was previously released and therefore not subject to withholding.").  Construing this as an "official disclosure" argument, the Court concludes that such an argument is without merit because the alleged prior disclosure of this information was done by the State Department, not the Department of Justice.  *See id.* (acknowledging that "the information [the FBI] is withholding was included in a privacy waiver that the State Department released to Mobley").  The D.C. Circuit has held it "do[es] not deem 'official' a disclosure made by someone other than the agency from which the information is being sought."  *Frugone v. CIA*, 169 F.3d 772, 774 (D.C. Cir. 1999); *see also Marino v. DEA*, 685 F.3d 1076, 1082 (D.C. Cir. 2012) ("[A]n agency does not waive its right to invoke an otherwise valid FOIA exemption when 'someone other than the agency from which the information is being sought' discloses it."

(quoting *Frugone*, 169 F.3d at 774)); *Moore v. CIA*, 666 F.3d 1330, 1333 n.4 (D.C. Cir. 2011)

("[T]o the extent [appellant] suggests that the release of the [record] *by the FBI* constitutes an

official acknowledgement *by the CIA*, his argument is foreclosed by our precedent." (citing

*Frugone*, 169 F.3d at 774–75)).  Since the information allegedly disclosed was released by the

State Department, and not the FBI, the FBI has every right to withhold the names or personal

identifying information of individuals who have not submitted privacy waivers to the FBI

pertaining to Mobley's request.  *See* Second Argall Decl. ¶ 17 ("Other than Sharif Mobley and

Nzinga Islam, the FBI did not receive any other privacy waivers pertaining to this request . . . .").

The FBI has subsequently reprocessed the document at issue and disclosed the name of Ms.

Islam, but the Court concludes that the FBI is entitled to withhold the names of other third parties

under FOIA Exemptions 6 and 7(C).  *See id.*; *see also* First Argall Decl. ¶ 51 (explaining privacy

interests justifying withholding of third parties' names under FOIA Exemptions 6 and 7(C)).

Lastly, Mobley's objection to the third category of information presents the question of

whether an agency may withhold the name of a deceased person under FOIA Exemption 6 on the

rationale that disclosure could result in harassment, public attention, or further grief for the

decedent's family members or close associates.  The FBI contends that its determination was

proper because the family members and close associates of the deceased officer "possess

substantial privacy interests" and thus disclosure could subject them to harassment or make them

a target for compromise.  *See* Defs.' Mem. in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Mem.")

at 22, ECF No. 25 (No. 11-2073).  The FBI cites the Supreme Court's decision in *Favish*, 541

U.S. at 166–67 for the proposition that "family members of deceased individuals have their own

substantial privacy interests in preventing the release of personal information about the decedents

when such disclosure could subject those family members to harassment, public attention, and

further grief."  Defs.' Reply at 25 (No. 11-2073).  Mobley, however, contends that the FBI's

position is "disingenuous" because "it is FBI's standard practice to only release information about third parties if the requester provides a privacy waiver, *proof of death*, or evidence of an overriding public interest." Pl.'s Surreply at 16 (No. 11-2073). Mobley also contends that "*Favish* was limited to a very narrow set of facts in which the records being sought were graphic photographs of a murder victim [sic]."[30]

On this point, Mobley is right to identify a certain level of hypocrisy in the FBI's position, given that the FBI regularly releases information about deceased individuals. He is also correct to distinguish the authority of *Favish* because the Supreme Court's holding in that case was limited to "surviving family members' right to personal privacy with respect to their close relative's *death-scene images*." *Favish*, 541 U.S. at 170 (emphasis added). Nevertheless, the D.C. Circuit has repeatedly held that the close relatives of a deceased person retain a certain amount of privacy interests after the decedent has passed away. *See Schrecker v. U.S. Dep't of Justice*, 254 F.3d 162, 166 (D.C. Cir. 2001) ("[O]ne's own and one's relations' interests in privacy ordinarily extend beyond one's death."); *Campbell*, 164 F.3d at 33 ("[C]ertain reputational interests and family-related privacy expectations survive death."); *see also Blanton v. Dep't of Justice*, 64 F. App'x 787, 789 (D.C. Cir. 2003) ("[W]hile death of an individual reduces the privacy interest, it does not eliminate it."); *Accuracy in Media, Inc. v. Nat'l Park Serv.*, 194 F.3d 120, 123 (D.C. Cir. 1999) ("[O]ur circuit has squarely rejected the proposition that FOIA's protection of personal privacy ends upon the death of the individual depicted."). The FBI explains that release of the deceased officer's identity would subject "his family members and other close associates . . . to unnecessary and unwelcome harassment which would constitute an unwarranted invasion of privacy." First Argall Decl. ¶ 52. Though the information

---

[30] The records at issue in *Favish* were death scene photographs of Vince Foster—a former aide to President Bill Clinton who committed suicide. *See Favish*, 541 U.S. at 160–61.

at issue in the instant actions—a deceased individual's identity—would almost surely impose a

lesser invasion of privacy than the information at issue in *Favish* and other D.C. Circuit cases,

*see, e.g.*, *Accuracy in Media*, 194 F.3d at 123 (noting "the powerful sense of invasion bound to

be aroused in close survivors by wanton publication of gruesome details of death by violence"),

it is still reasonable to conclude that even merely releasing the deceased officer's identity would

impose *some* unwarranted invasion of personal privacy upon the deceased officer's close

relatives.

The FBI has decided to withhold the identity of the deceased officer under FOIA

Exemptions 6 and 7(C).  *See* First Argall Decl. ¶ 52.  Mobley has not contested the fact that the

records containing the deceased officer's identity were "compiled for law enforcement

purposes," and therefore the Court will analyze the FBI's withholding under the less demanding

standard of Exemption 7(C), which protects law enforcement records that "could reasonably be

expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C);

*see also Am. Civil Liberties Union v. U.S. Dep't of Justice* ("*ACLU/DOJ II*"), 655 F.3d 1, 6 (D.C.

Cir. 2011) ("'Exemption 7(C) is more protective of privacy than Exemption 6' and thus

establishes a lower bar for withholding material.").  "In deciding whether the release of particular

information constitutes an 'unwarranted' invasion of privacy under Exemption 7(C), [a court]

'must balance the public interest in disclosure against the [privacy] interest Congress intended

the Exemption to protect.'"  *ACLU/DOJ II*, 655 F.3d at 6 (quoting *U.S. Dep't of Justice v.

Reporters Comm. for Freedom of Press*, 489 U.S. 749, 776 (1989)).  As discussed above, the FBI

has established at least a moderate privacy interest protected by Exemption 7(C), and Mobley

has not offered any public interest that disclosure would serve.  Therefore, recognizing that

"something, even a modest privacy interest, outweighs nothing every time," *Nat'l Ass'n of

Retired Fed. Emps. v. Horner*, 879 F.2d 873, 879 (D.C. Cir. 1989), the Court holds that the FBI

properly withheld the identity of the deceased foreign law enforcement officer under FOIA Exemption 7(C).

In sum, none of Mobley's objections to the FBI's withholding decisions under FOIA Exemptions 6 and 7(C) are sufficient to deny summary judgment to the FBI. Therefore, the FBI is entitled to summary judgment with regard to all of its withholding determinations in the instant actions.

e)      *FOIA Exclusion Under 5 U.S.C. § 552(c)*

As discussed above, *see supra* note 10, § 552(c) of the FOIA permits agencies to "treat . . . records as not subject to the requirements" of the FOIA when, *inter alia*, a request involves access to "records or information compiled for law enforcement purposes" to the extent that such law enforcement records (1) "could reasonably be expected to interfere with enforcement proceedings," (2) "the investigation or proceeding involves a possible violation of criminal law," (3) "there is reason to believe" that "the subject of the investigation or proceeding is not aware of its pendency," and (4) "disclosure of the existence of the records could reasonably be expected to interfere with enforcement proceedings." *See* 5 U.S.C. §§ 552(b)(7)(A), 552(c)(1). Section 552(c) likewise permits agencies to "treat . . . records as not subject to the requirements" of the FOIA whenever someone requests "informant records maintained by a criminal law enforcement agency." *Id.* § 552(c)(2). Finally, § 552(c) permits the FBI to issue a *Glomar* response to any request for records "pertaining to foreign intelligence or counterintelligence, or international terrorism" as long as "the existence of the records remains classified information." *Id.* § 552(c)(3).

As stated in the FBI's brief, counsel for the plaintiff inquired whether the FBI would be relying on the exclusion contained in § 552(c), and therefore, pursuant to the FBI's standard policies, the FBI has submitted an *ex parte*, *in camera* declaration that "address[es] the exclusion

claim." *See* Defs.' Mem. at 17 n.3 (No. 11-2073).  The Court will not comment publicly on whether or not the FBI has in fact relied upon any of the exclusions contained in § 552(c).  Upon review of the FBI's *ex parte*, *in camera* declaration, the Court can conclude that the objections raised by the plaintiffs to any potential invocation of § 552(c) are unavailing.  *See* Pl.'s Opp'n at 32 (No. 11-2073).

D.    **Segregability**

The plaintiffs' final objection to the defendants' handling of their FOIA/PA requests is that State and the CIA have not met their burden of demonstrating that "[a]ny reasonably segregable portion of a record [was] provided to [the plaintiffs] after deletion of the portions which are exempt under [the FOIA]."  5 U.S.C. § 552(b); *see* Pls.' Opp'n at 48–49 (No. 11-2072); Pl.'s Opp'n at 17 (No. 11-2073).  The plaintiffs argue that the declarations of the CIA and the State Department were "boilerplate" and "conclusory," and therefore those two agencies have failed to meet their burden of establishing that all reasonably segregable, non-exempt information was released.  *See* Pls.' Opp'n at 48–49 (No. 11-2072); Pl.'s Opp'n at 17 (No. 11-2073).  The CIA responds that its sworn declaration was sufficient to meet its segregability burden because the declaration explained that "there are no reasonably segregable portions of these six records that can be released to Plaintiffs" because "the nature of these documents prevent the CIA from even disclosing the titles of the records, as they tend to reveal the specific information the CIA is seeking to protect."  *See* Defs.' Reply at 12–13 (No. 11-2073); Third Meeks Decl. ¶ 9 n.3.  State similarly responds that it has met its burden based on the presumptive good faith of the statements in its sworn declarations that no further segregation of non-exempt information is possible, as well as "the evidence of [State's] segregability process that is apparent on the face of the partially released records."  *See* Defs.' Reply at 30–31 (No. 11-2072).

The D.C. Circuit has acknowledged that establishing adequate segregation of non-exempt material "presents problems for the agency since . . . segregability depends entirely on what information is in a document and how it is presented." *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 261 (D.C. Cir. 1977). Therefore, although "agencies should not be forced to provide such a detailed justification that would itself compromise the secret nature of potentially exempt information," agencies "must be required to provide the reasons behind their conclusions in order that they may be challenged by FOIA plaintiffs and reviewed by the courts." *Id.* To this end, the Circuit has said that "[i]n addition to a statement of its reasons, an agency should also describe what proportion of the information in a document is non-exempt and how that material is dispersed throughout the document." *Id.* Under *Mead Data*, if a small proportion of the information is non-exempt, the agency's explanatory burden is less, and if a larger proportion of the information is non-exempt, "the courts should require a high standard of proof for an agency claim that the burden of separation justifies nondisclosure or that disclosure of the non-exempt material would indirectly reveal the exempt information." *Id.*

On the other hand, however, the Circuit has more recently held that "[a]gencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material," which must be overcome by some "quantum of evidence" by the requester. *Sussman*, 494 F.3d at 1117. Indeed, certain, more recent decisions from the D.C. Circuit have indicated that the standard first articulated in *Mead Data* has been relaxed. Those decisions have held that an agency may satisfy its segregability obligations by (1) providing a *Vaughn* index that adequately describes each withheld document and the exemption under which it was withheld; and (2) submitting a declaration attesting that the agency released all segregable material. *See, e.g., Loving v. Dep't of Def.*, 550 F.3d 32, 41 (D.C. Cir. 2008) (stating that "the description of the document set forth in the *Vaughn* index and the agency's declaration that it released all

segregable material" is "sufficient for [the segregability] determination"); *Johnson v. Exec. Office for U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir. 2002) (upholding agency's segregation efforts based on "comprehensive *Vaughn* index" and "the affidavits of [agency officials]").

Under the segregability standards more recently articulated by the D.C. Circuit in *Loving* and *Johnson*, the Court concludes that the CIA and the State Department have adequately demonstrated they have released all reasonably segregable, non-exempt portions of all withheld records. As to the CIA, this conclusion is supported by Ms. Meeks' explanation that the nature of the withheld documents is such that revealing even small portions of the documents would "tend to reveal the specific information the CIA is seeking to protect." Third Meeks Decl. ¶ 9 n.3. Even under the more demanding *Mead Data* standard, this would be sufficient because Ms. Meeks' statement establishes that no portion of the six withheld records is non-exempt, and therefore the CIA has released everything that it can, which is nothing at all. *See* Third Meeks Decl. ¶ 9 ("[T]he records themselves reveal certain sensitive but unclassified intelligence sources and methods."). The CIA's explanation is thus neither boilerplate nor conclusory, and it is entitled to a presumption of good faith that the plaintiffs have failed to rebut. *See Sussman*, 494 F.3d at 1117.

As to the State Department, the Court's conclusion that the agency's segregability obligations were satisfied is supported by the *Vaughn* index's reasonably detailed description of the documents in question, as well as Ms. Walter's sworn assurance that "[a]ll of the withheld information was reviewed for segregability prior to release and prior to the submission of [her] prior declaration." Second Walter Decl. ¶ 32. Additionally, "in an abundance of caution," Ms. Walter further "re-reviewed each document," and has averred that "there is no additional material that may be segregated and released." *Id.* Given the "presumption that [State] complied with the obligation to disclose reasonably segregable material," *Sussman*, 494 F.3d at 1117, the

Court concludes that "[t]he combination of the *Vaughn* index and the affidavits of [Ms. Walter] are sufficient to fulfill the agency's obligation to show with 'reasonable specificity' why [the withheld] document[s] cannot be further segregated," *Johnson*, 310 F.3d at 776.

## IV.   CONCLUSION

In summary, the Court concludes that all four defendants have demonstrated that their responses to the plaintiffs' FOIA/PA requests were appropriate and satisfied all of the agencies' obligations under the FOIA and the Privacy Act, with the exception that the CIA has failed to demonstrate fully the adequacy of its search and must perform a supplemental search as a result. Therefore, the Court will grant summary judgment to the Department of Defense, Department of State, and Department of Justice on the plaintiffs' claims, and the Court will grant in part and deny in part summary judgment to the CIA on the plaintiffs' claims.

An appropriate Order accompanies this Memorandum Opinion.


Date: February 7, 2013

/s/ *Beryl A. Howell*
BERYL A. HOWELL
United States District Judge